**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VIRGINIA SHARP, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 08 C 1002 |
| vs. ) | |
| ) | Judge St. Eve |
| TRI-FI, LLC d/b/a TRI-FINANCIAL , ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND AWARD OF DAMAGES**

Pursuant to F.R.C.P. 55 (a) and (b), Plaintiff respectfully moves this Court for entry of judgment by default against defendant Tri-Fi, LLC d/b/a Tri-Financial ("Defendant"). In support of this motion, Plaintiff states as follows:

**I.   TRI-FI HAS BEEN AWARE OF THE LITIGATION**

   **A.   Contacts by Counsel for Tri-Fi**

   1.   This is an action brought under Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"). Plaintiff has alleged that Defendant left messages for Plaintiff, which violated 15 U.S.C. §1692d(6) and 15 U.S.C. §§1692e,1692e(2), 1692e(10), 1692e(11), and 1692e(14) because the messages did not contain the warning required by 15 U.S.C.§1692e(11), the messages failed to identify the Defendant, in violation of 15 U.S.C. §1692d(6). The Defendant also violated 15 U.S.C. §1692e(5) by falsely representing in the messages and a return telephone call by Plaintiff that the Defendant had filed suit against Plaintiff in the Will County Court, when no such lawsuit had been filed.

   2.   This action was filed February 19, 2008. Defendant was properly served

1

on February 25, 2008, Exhibit A, but has not appeared or answered.

       3.      On February 25, 2008, Plaintiff's counsel was contacted by telephone by an individual named Michael A. Benson ("Benson") from Springville, New York, who indicated that he represented the Defendant.  Initially, Benson did not request an extension or broach the topic of settlement.  Instead, Benson appeared to be interested in obtaining information about Plaintiff, presumably to further Defendant's attempts to collect the debt purportedly owed by Plaintiff, and carried out this conversation in a tone generally employed by collectors contacting a debtor - not between counsel.

       4.      Plaintiff's counsel informed Benson that Plaintiff disputed the debt and requested verification, as Plaintiff never recalled having a Discover account, and there was no debt owed to Discover on her credit report.  (Affidavit of Virginia Sharp ("Sharp Aff."), Exhibit B). Counsel further stated that if the Defendant wanted an extension of time to answer or otherwise plead, that Plaintiff would agree to a reasonable request, and that if Defendant wanted to settle, Plaintiff was willing to make a demand, but was not willing to discuss the disputed debt until Defendant provided verification showing that it was an account of Plaintiff's, and had not been otherwise paid or settled.  If the debt could be verified, Plaintiff counsel informed Benson that Plaintiff would discuss the debt only in the context of debt forgiveness as a component of a settlement demand, as the debt itself was otherwise irrelevant to Plaintiff's claims in the federal suit.  Benson threatened to assert collection counterclaims against Plaintiff in this litigation, even though such counterclaims cannot be brought in a federal suit.  Benson then told Plaintiff's counsel that if he continued conversations it would not be with her, but with one of her male partners and hung up the phone.

5. Notwithstanding Benson's statements, on February 26, 2008, he sent a letter by fax and mail to Plaintiff's counsel requesting an extension of time of 60 days, purportedly for the purpose of discussing settlement. (Exhibit C). Plaintiff's counsel responded the same day, reiterating the request for account information to verify the debt, declined to agree to the 60 days requested, but did agree to a 30 day extension of time. Plaintiff's counsel further cautioned Benson that despite Plaintiff's informal agreement, he would need to file a motion formally requesting the extension from the Court to ensure that a default was not entered. Plaintiff's counsel again requested verification of the debt. (Exhibit D)

6. In response to the repeated disputes and requests to verify the debt, Benson provided no more than plaintiff's address, social security number, and the purported balance ($427.31) allegedly owed to "Discover" as "verification." (Exhibit E). Plaintiff's counsel again responded, stating this was inadequate and did not verify the debt. Plaintiff's counsel further reiterated Ms. Sharp had no recollection of ever owing a debt to Discover, that no such debt appeared on her credit report owed to Discover or any other entity. Again, Plaintiff's counsel requested details, including but not limited to as the account number, any other prior owner of this debt, and charge off date of this purported debt. (Exhibit F). In response to this, Benson left a voicemail, claiming that the debt owed was $427.31, and that it was owed to CNE Associates, which is "the same as Discover," had an account number of "14991," was opened in August 1999 and had a date of last payment of May 2003. Again this information did not correlate to any of Ms. Sharp's accounts listed on her credit report or in her own records (Sharp Aff., Exhibit B). The "account number" provided did not appear to be that of a credit card, and CNE Associates is not an affiliated entity of Discover. In fact, it is a debt buyer located in New

3

York state not far from where Defendant and Benson are located.

       7.     Plaintiff's counsel again informed Benson of the inability to match the account and again disputed the debt. Because it did not appear that the account in question belonged to Plaintiff and that Defendant was completely unable to verify the debt, Plaintiff's counsel also sent a settlement for monetary relief, not including any debt forgiveness, as forgiveness of a debt not owed by Plaintiff would not provide any consideration.

       8.     On February 29, 2008, the Court set this matter for an initial status set for March 31, 2008. The order directed the parties to file a Joint Status Report by March 26, 2008. Plaintiff's counsel promptly forwarded the order by e-mail to Benson. (Exhibit F).

       9.     In response to this message, Benson contacted Plaintiff's counsel by phone. He again wished to discuss the disputed debt, despite having no further information to offer. He threatened to proceed with having a lawsuit filed against Plaintiff to collect the debt. In addition, he accused Plaintiff's counsel of engaging in ex parte communications with the Court which he claimed resulted in the entry of the February 29, 2008 minute order. Plaintiff's counsel patiently attempted to explain the general procedure in the Northern District of Illinois including the entry of such initial orders. In response, Benson insisted Plaintiff's counsel was engaging in unethical conduct. Although Defendant had made no settlement proposal at this point, Benson also told counsel that he believed she would also fail to inform Plaintiff *if* Defendant made a settlement offer. Because Benson continued to conduct himself in an aggressive and accusatory manner, without any basis, at this point, Plaintiff's counsel informed Benson that she did not believe further discussion with him would be conducive of settlement, but that if the Defendant made a proposal or had other information Plaintiff would consider it,

and respond, but stated that from this point forward that any future communications between counsel and Benson would be conducted in writing.

10. Benson thereafter sent a settlement demand by letter, which included forgiveness of the disputed debt and which did not provide for attorney's fees and costs. This settlement proposal was rejected by Plaintiff on March 6, 2008. (Exhibit G) Again, Plaintiff's counsel requested verification of the debt and outlined the dispute in detail and requested that Benson have local counsel contact Plaintiff's counsel so that a proposed discovery plan could be discussed and filed with the Court. On March 6, 2008, by email, Benson indicated that more information about the debt would be sent.

### B.　　Production of Credigy Affidavit

11. Plaintiff's counsel received no communication from Benson until March 18, 2008. On this date he faxed a copy of an affidavit from someone with Credigy Receivables, Inc. (Exhibit H), and a copy of an agreement where Discover was selling a group of accounts to an entity called First Select, Inc.

12. According to this affidavit, Ms. Sharp's alleged Discover account was opened in August of 1996, and was charged off by Discover on June 30, 1999. This alleged debt was transferred to First Select, Inc. on July 31, 1999. According to this affidavit, at the time of the transfer, the account purportedly had an unpaid balance of $1,508.81 - not $427.31, as originally represented. It identified two account numbers assigned to the account, one from Discover and one from First Select. The affidavit claimed to have attached as Exhibit A the "Original Terms and Conditions" of the Discover account. There was no document attached as Exhibit A.

13. The affidavit further represents that First Select, Inc. attempted to collect the debt from Plaintiff and sent her "terms and conditions" which were purportedly attached as Exhibit B. There was no document attached as Exhibit B.

14. The affidavit represented that the date of the last payment on the account by the "debtor" was December 7, 2001, after the sale to First Select, Inc. in July of 1999. However, later in the affidavit, it represents that the "debtor" made no payments to First Select, Inc. (Exhibit H pp. 2-3).

15. According to the affidavit, First Select, Inc. sold the account to Credigy on December 27, 2002. The affidavit does not indicate that Credigy contacted Plaintiff or made any attempts to collect the debt. It does however, represent that it received information from First Select, Inc. including, among other things, "the VISA account number assigned to Debtor's account . . . ," despite previously representing that it was a Discover account. (Exhibit H, p. 5)

16. Plaintiff did not have any recollection of ever being contacted by First Select or Credigy. Plaintiff and her counsel again checked Plaintiff's credit report and Plaintiff reviewed all of her own records to see if any of this information - such as account numbers and dates - matched any account she ever held. It did not. Neither Discover nor First Select, nor Credigy reported this debt to the credit bureaus or made collection attempts directed towards Plaintiff.

17. Plaintiff's counsel responded to Benson, making clear that Plaintiff was not interested in any settlement discussion involving forgiveness of debt, as the debt did not appear to be Plaintiffs, and even presuming the contradictory information in the affidavit was accurate - the debt was beyond the statute of limitations. Plaintiff's counsel also pointed out the

inconsistencies in the affidavit and the missing exhibits and reminded Benson of the upcoming deadline for filing a joint status report.  (Exhibit I).

        18.     Benson wished to continue discussions regarding the purported debt, and became increasingly hostile at Plaintiff's counsel's insistence that the parties exchange communications in writing.  He threatened repeatedly to initiate a lawsuit against Plaintiff, despite being unable to verify the debt as belonging to Plaintiff.  Little progress was made closing the gap between the parties' positions on settlement.  Because of the deadline and upcoming status, in an attempt to expedite any discussions, Plaintiff's counsel sent Benson the bottom line at which they would settle and left that offer open until such time as Plaintiff would need to file a status report.  Plaintiff left open the option of a settlement conference with the magistrate judge, if the parties could not agree on their own and also offered to have the Court determine the attorney's fees if the parties could agree on Plaintiff's recovery, but continued to decline to conduct discussions with Benson by phone because of his continued threats and unprofessional comments directed toward Plaintiff and her counsel.

        19.     Defendant did not accept the final proposal made by Plaintiff before the deadline to file a joint status report.  As no appearance was filed by Defendant, and no locally-admitted attorney contacted counsel, Plaintiff's counsel filed a status report on behalf of Plaintiff only on March 26, 2008.  Two days later, Benson contacted Plaintiff's counsel indicated that he contacted the Court regarding the status and wanted to talk to Counsel regarding the same.  He later forwarded the response he received from the Court's minute clerk, including his initial message wherein he misrepresented to the Court that Plaintiff's counsel refused to discuss a discovery schedule with him.  Benson never requested that Plaintiff's counsel discuss the

discovery schedule with him. For a period of weeks prior to the status, Plaintiff's counsel reminded Benson of the upcoming deadline and status and the need for local counsel to participate in the same, as Benson is not admitted in this district, and had not filed an appearance. The initial status was continued from March 31, 2008 to April 10, 2008 following Benson's request.

       **C.**     **Renewed Settlement Discussions**

       20.     After the continuance, Benson seemed to have a change of heart and contacted Plaintiff's counsel to renew discussions, but also wanted to continue to discuss the debt. Plaintiff's counsel declined to discuss the debt with Benson further, but offered to put the last offer back on the table. After some back and forth on the issue, the Defendant accepted the offer on April 2, 2008 (<u>Exhibit J</u>) but continued to insist that the Defendant would sue Plaintiff to collect the time-barred debt, in subsequent correspondence. Plaintiff's counsel attempted to send Benson citations and case law regarding the collectibility of a debt of that age, and FDCPA suits stemming from those attempts in a hope to put an end to Benson's collection efforts and threats, but these attempts were to no avail.

       21.     Plaintiff's counsel sent a draft release and settlement agreement to Benson the same day, April 2, 2008, and offered to get an agreement executed to him quickly, once agreed upon, to enable the parties to consummate the agreement before Defendant would need to retain local counsel and appear at the April 10, 2008 status.

       22.     Following some discussion on the language of the agreement, Benson approved it on Saturday, April 5, 2008. Plaintiff's counsel immediately emailed it to her client, who had left town the preceding day to visit her mother in southern Illinois, but planned to take

her laptop on the trip.

23. Ms. Sharp signed the agreement and faxed it back to her counsel on Monday, April 7, 2008. Plaintiff's counsel scanned in the agreement and emailed it to Benson that morning, requesting that he overnight the certified check and agreement signed by Defendant so that a stipulation of dismissal could be filed in advance of the status on April 10, 2008.

24. In the evening on April 7, 2008, Benson acknowledged receipt of the executed agreement, but refused to send the check or agreement without an original signature. Although Plaintiff's counsel believed this was unreasonable, in light of Defendant's interest to avoid appearing at the status, she contacted Plaintiff who made every effort to get an original signature to her counsel as expeditiously as possible. As there was no Federal Express located near her mother's home, she sent the signed original by express mail on the morning of April 8, 2008. Delivery was promised by the next day, but it was not received by counsel, who did not learn that it was coming by express mail, as opposed to Federal Express, until the afternoon of April 8, 2008. Plaintiff tracked the shipment, which she learned was now at the post office but which had not delivered with the firm's mail earlier in the day.

25. Plaintiff's counsel attempted to reach a middle ground with Benson in order to have the settlement completed and case dismissed in advance of the status. Counsel offered to hold the check and not negotiate it until the original was sent, explained the Plaintiff's circumstances and the sending of the signature, and requested that the check be overnighted based upon these representations. (Exhibit L) At this point Benson asked Plaintiff's counsel to re-send the agreement him for his client to execute and said he would send it with the check.

Benson also contacted the Court regarding the status. The minute clerk contacted Plaintiff's counsel after receiving the call from Benson. Plaintiff's counsel informed the minute clerk that she expected to file a notice of dismissal the following day after receiving the check and agreement from Benson. The minute clerk returned Benson's call and informed him of this communication, and further informed him that there would be no need to appear if Plaintiff's counsel was able to file the notice of dismissal as planned. (Exhibit M)

26. Plaintiff's counsel did not receive the check and agreement on April 9, 2008, and contacted Benson requesting verification that the check had been sent, and suggesting that he track the shipment, as if the notice of dismissal was not filed soon, the status on the following day would not be stricken.

27. Benson apparently misunderstood the minute clerk, insisted that there was no appearance, and originally would not respond to counsel's e-mail regarding the shipment. Assuming the check was not sent as promised, Plaintiff's counsel asked how long it would take for him to send the check, and offered to request that the status be extended to allow him to do so. He told Plaintiff's counsel to ask for a week. (Exhibit N). Plaintiff's counsel promptly called the Court's minute clerk to request that the status be continued until April 17, 2008. Inexplicably, at this point, Benson became uncooperative and hostile, and claimed to be upset that Plaintiff's counsel called the Court to request an extension without him on the phone (he asked to be conferenced on the call after sending Exhibit N and after Plaintiff's counsel had already spoken to the clerk)-- notwithstanding the fact that he had previously contacted the clerk himself on several occasions, as recently as the preceding day, and notwithstanding the fact that Plaintiff's counsel did so simply to obtain additional time for the Defendant to comply with the

Agreement, and explicitly told him she would do so in advance.

28.     The Court agreed to Plaintiff's counsel's the request and continued the status to April 17, 2008.  Plaintiff's counsel informed Benson, who continued to respond in a hostile manner, despite the fact that all matters were settled.  He then stated that he needed *four* original signatures, although aware that Plaintiff had already overnighted one signed agreement to Plaintiff's counsel.  (Exhibit O)  Plaintiff's counsel reiterated that she would dismiss the case with prejudice upon receipt of the check and agreement, and if it was received by April 16, 2008, there would be no need to appear on April 17, 2008, but if that could not be accomplished that counsel would appear on Plaintiff's behalf, and for any matters other than consummation of the settlement, that from now on counsel would only communicate with an attorney who has appeared in the case and is of record.  In response Benson stated, "I am on record. I contacted the court because you failed to return a phone call. I can go the distance. And I am ready for it my friend."  (Exhibit P)  Benson had at no time filed an appearance.  Benson had not even attempted to call Plaintiff's counsel since sometime in mid-March, at which time she responded to his message in writing, as discussed above.

29.     Plaintiff's original signature was received by her counsel on April 9, 2008 and overnighted to Benson on the same date, accompanied by a cover letter from Plaintiff's counsel stating that the case would be dismissed upon receipt of the settlement check and signed agreement, and enclosing the Court's order continuing the status to April 17, 2008.  (Exhibit Q).  It was received and signed for at Benson's office on April 10, 2008.

30.     Defendant never sent a check or signed agreement, despite having a copy of the signed agreement on April 4, 2008, and an original executed agreement on April 10, 2008.

11

Defendant did not appear in Court on April 17, 2008, despite being well aware of the pendency of the action and status date.

## II.    Damages and Attorney's Fees

31.    Under 15 U.S.C. § 1692k(a)(2)(A), an individual Plaintiff can receive as statutory damages a maximum of $1,000.00.  A person who is successful on a FDCPA claim can also be awarded actual damages suffered on account of a violation should he or she prevail on a FDCPA claim.

32.    Plaintiff requests that she be awarded the maximum $1,000.00 statutory damage award and actual damages of $2,000.  The violation of the FDCPA by Defendant was egregious.  The Defendant claimed to have filed suit against Plaintiff to collect a debt, and left the messages on the general voicemail at her place of employment, where it could have been heard by others.  It also failed to make the disclosures required by the FDCPA.

33.    Plaintiff believes that the violations of Defendant support an award of the maximum statutory damages and requests that the Court enter judgment in that amount.  Tri-Fi's collector also made this misrepresentation to Plaintiff directly, and attempted to threaten and demean her when she claimed she did not know anything about the alleged debt.  Tri-Fi's campaign of harassment directed towards Plaintiff did not stop there, however, it continued after she retained counsel and filed suit.  Despite having no documents whatsoever to verify this almost 10-year old debt, Tri-Fi continued its threats to sue Plaintiff.  Tri-Fi repeatedly gave contradictory and erroneous information about this alleged account, requiring Plaintiff to repeatedly check all of her old records, bank statements and credit reports for any information at all that matched that being offered by Tri-Fi.  Tri-Fi was not the first company to buy this

alleged debt, nor was it even the second - it was the fourth entity to acquire it, a "bottom feeder" among debt buyers, obtaining those accounts many others deemed uncollectible. Generally, once such debts are formally disputed, the debt buyers who are aware that they cannot verify it, will cease collection attempts. In this case, the reverse occurred. Notwithstanding Plaintiff's repeated disputes, in the face of its inability to verify this debt, Tri-Fi continued to wage its threats against Plaintiff through her counsel. The conduct of Tri-Fi and its agents supports an award of the maximum statutory damages and a modest amount of actual damages for exposing her to potential embarrassment at her place of employment and the time and effort she had to expend reviewing and searching her records each time Tri-Fi came up with new, contradictory, and erroneous information about this purported account.

34. 15 U.S.C. §1692k(a)(3) also provides for the award of attorney's fees and costs if a plaintiff prevails on his or her claim.

35. Plaintiffs also request an award of $10,975.00 in attorney's fees and $404.49 in costs of suit. Generally, suits such as Plaintiff's can be resolved expeditiously at the onset of litigation. Unfortunately, that was not the case here, as the Defendant or its agents insisted upon repeated discussion and argument relating to the disputed debt, despite the fact that it was irrelevant to the federal suit, was time-barred, and could not be verified. Plaintiff's counsel attempted to represent her client's interests in the face of repeated threats and misrepresentations and was eventually successful in reaching an agreement, and preparing a settlement agreement that was approved by Tri-Fi. Defendant was provided with a signed settlement agreement, not once but twice. Counsel had prepared and was holding a notice of dismissal that she intended to file upon receipt of the check. Defendant did not comply with the

agreement. Whether or not it ever intended to do so, only Tri-Fi can answer, but it has failed to appear. It may be that the entire exchange was no more than an extended attempt to collect the invalid debt, or Defendant's attempt to "punish" Plaintiff or her counsel for filing suit against Defendant. In light of the work performed, Plaintiff believes that the fees and costs sought are reasonable, and has attached as <u>Exhibit R</u>, the Declaration of Daniel A. Edelman, in support of the request, including a detailed statement of Plaintiff's counsel's time and expenses incurred in this case.

WHEREFORE, Plaintiff respectfully requests that this Court enter an order declaring defendant Tri-Fi, LLC, to be in default, and that judgment be entered in favor of Plaintiff and against Defendant, in the amount of $3,000.00 to Plaintiff Virginia Sharp and $11,379.49 in attorney's fees and costs awarded to Plaintiff's counsel.

Respectfully submitted,


/s/ Michelle R. Teggelaar


Daniel A. Edelman (dedelman@edcombs.com, courtecl@edcombs.com)
Michelle R. Teggelaar (mteggelaar@edcombs.com)
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## CERTIFICATE OF SERVICE

       I, Michelle R. Teggelaar, hereby certify that on April 23, 2008 the foregoing document was served by regular and certified U.S. Mail to:

Tri-Fi, LLC
286 Schenck St., Suite A
North Tonawanda, NY  14120


                                                       s/Michelle R. Teggelaar