# 08 C 1002

AO 440  (Rev. 05/00) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**JUDGE ST. EVE**
**MAGISTRATE JUDGE COX**

## SUMMONS IN A CIVIL CASE

Virginia Sharp,
      Plaintiff,

CASE NUMBER:

V.

ASSIGNED JUDGE:

Tri-Fi, LLC, d/b/a Tri-Financial,
      Defendant.

DESIGNATED
MAGISTRATE JUDGE:

TO: (Name and address of Defendant)

Tri-Fi, LLC, d/b/a Tri-Financial
286 Schenck Street, Suite A
North Tonawanda, NY 14120

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Edelman Combs Latturner & Goodwin
120 S. LaSalle St.
18th Floor
Chicago, IL 60603

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

**Michael W. Dobbins, Clerk**

**February 19, 2008**

(By) DEPUTY CLERK

**Date**


EXHIBIT
A

AO 440  (Rev. 05/00)  Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE  2/25/08 |
|---|---|
| NAME OF SERVER (PRINT)  Ted Kwiatkowski | TITLE  Process Server |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant.  Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☒ Other (specify):  Served John Hummel, owner of
Tri-Fi,LLC d/b/a Tri-Financial

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
|  |  |  |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on  3/17/08
_____        _____
Date                                   Signature of Server

Smart Serve
115 S Prince Dr
Depew, NY  14043-4735
_____
Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| VIRGINIA SHARP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 1002 |
| vs. | ) | |
| | ) | Judge St. Eve |
| TRI-FI, LLC d/b/a TRI-FINANCIAL , | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>AFFIDAVIT OF VIRGINIA SHARP</u>

I, Virginia Sharp, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. §1746, that the following statements are true:

1.     I am over 18 years of age and a resident of the State of Illinois.

2.     On the morning of Monday, January 21, 2008, I retrieved a message on the voicemail at my place of employment.   To the best of my recollection, the message had been left over the weekend.  The message was left in the general voicemail.

3.     In this message, the caller said he was calling me about a "fraud issue" and identified himself as "Mr. Seiko." He did not say where he was calling from.  I deleted the message quickly because I did not want any of my co-workers to hear a message regarding my personal business.  I was afraid that someone had stolen my identity.

4.     I returned the call between 7:30 and 8:00 a.m. on January 21, 2008.  The individual answering the telephone told me that Mr. Seiko was not in the office yet, but he said he could look up my account.  He did, and when he came back on the phone he was very rude. He told me that I owed a debt for a Discover Card, listed with my social security number.  I told

1


EXHIBIT
B
Bumberg No. 5209

him that I did not recall ever having a Discover Card. He said that he was looking at it on my credit report and it was listed as "Clerigy" and was opened in 1999 and the last time I made a payment was in 2003. I asked him who he was and he said he was with Tri-Fi, but would not give me his name. He told me that if I did not pay it immediately that Tri-Financial would pursue the lawsuit that they filed at the Will County Court House, and he read a "docket number."

5.      I again told this person that I did not know what he was talking about, and he said, "Do I need to talk slower so that you can get it? We are suing you." That made me very upset. I told him never to call me at this number again and I hung up the phone.

6.      On January 29, 2008, a second message was left on the general voicemail at my place of employment. I forwarded this message to the voicemail on my personal direct line. This message stated:

> "Hello, this message is for Virginia Sharp. My name is Mr. Seiko. This message serves as a notice informing yourself, social security number last four digits 9820, uh, let's see, this is concerning case docket number 14748 out in Will County. I strongly advise if you have any desire to resolve this matter on a voluntary out of court basis, that yourself or your attorney immediately return my call at 1-877-268-9286 ext. 232. My name is Mr. Seiko.

7.      I did not return this call.

8.      I thought I had been sued.

9.      I obtained a copy of my credit report after receiving these calls. My credit report did not list any debt for a Discover Card and it did not contain any report from "Clerigy."

10.     Prior to these calls from Tri-Fi, I had never been contacted by any debt collector claiming that I owed a Discover Card debt.

11.     After I filed this lawsuit, over a period of weeks, my attorney provided me

2

with three different numbers that Tri-Fi, LLC's attorney claimed to be for this debt. Each time an account number was provided, I checked all of my old account records to look for a match. I have retained records for all of my credit cards back to 2000, and none of my accounts matched any of these three numbers.

12.     My attorney also provided me with the name of a different company, called CNE Associates, that Tri-Fi's attorney claimed to be the original creditor of this account. I had never heard of CNE Associates, but I again checked all of my account records for any reference to this company, and I again did not find anything.

13.     Tri-Fi's attorney provided a document to my attorney that represented that the last payment that was made on this account was for $100 back in December 27, 2001, not 2003 as I was told on the phone by the person at Tri-Fi, so I checked my bank records for that year. I did not find any payment on any account or for any purpose on that date and in that amount.

Executed this 21 th day of April 2008 at LOCKPORT, Illinois.

_Virginia Sharp_
Virginia Sharp

Subscribed and sworn to me this 21st day of April 2008.

_Taryn C White_
Notary Public

"OFFICIAL SEAL"
TARYN. C. WHITE
Notary Public, State of Illinois
My Commission Expires 03/20/12

3

## MICHAEL A. BENSON

Attorney at Law

77 North Buffalo Street
P.O. Box 411
Springville, New York 14141

e-mail address:
bensonlaw1@verizon.net

(716) 592-2900
Fax - (716) 592-5170

Buffalo Office:
69 Delaware Avenue Suite 500
Buffalo, NY 14202
(716) 856-1010 ext 501

Legal Assistant:
Brooke Folckemer

Brookelaw@verizon.net

February 25, 2008

Ms. Michelle Teggelaar
120 S. LaSalle Street
18th Floor
Chicago, Illinois 60603

## VIA FAX (312) 419-0379 AND U.S. MAIL

Re:   Virginia Sharp v. Tri-Financial
United States District Court

Dear Ms. Teggelaar:

I am in receipt of a Summons and Complaint filed in United States District Court, Northern District of Illinois regarding the above-mentioned matter that was served on my clients on February 25, 2008. As you can recall, we also discussed same on the telephone today.

At this time, I am requesting an extension of time to answer this Complaint, as well as a possibility of resolving this matter with a settlement. I am requesting a sixty (60) day extension.

Kindly contact me at (716) 592-2900 so that we may discuss this matter further.

Your courtesy and cooperation is appreciated.

Very truly yours,

MICHAEL A. BENSON

MAB/cb
CC:   John Yim

EXHIBIT
C

**From:** bensonlaw1@verizon.net
**To:** Michelle Teggelaar
**Sent:** 2/28/2008  11:02AM
**Subject:** Re: Sharp v. Tri-Financial

Ms. Teggelaar:

Virginia Sharp with an address of 16621 W.144th Place, Lockport IL 60441 with a SS# of ~~Redacted~~ owes Discover 427.31.

Kindly send a settlement Demand.


From: Michelle Teggelaar <MTEGGELAAR@edcombs.com>
Date: 2008/02/26 Tue AM 09:34:53 CST
To: bensonlaw1@verizon.net
Subject: Sharp v. Tri-Financial

Mr. Benson: If you have additional information regarding the alleged debt, such as the account number, name of creditor and/or prior owner, balance, date of charge off, etc., please forward it to my attention so that I can discuss the same with my client. We can certainly send you a settlement demand. I'll agree to a 30 day extension, as I think that should be enough time for us to discuss and formalize a possible settlement. If it appears that more time would be needed I am certainly willing to discuss it as we approach the 30 days. However, you should be aware that some of the judges in this district will sua sponte enter a default on the 21st day after service if no answer or motion for extension has been filed. I have not seen Judge St. Eve do this in any of my other cases, but I cannot say for certain what her practice is in that regard. Michelle R. TeggelaarEdelman, Combs, Latturner & Goodwin, LLC120 S. LaSalle St., Suite 1800Chicago, IL  60603(312) 739-4200(312) 419-0379 (fax)


Michael A. Benson, Esq.
77 N. Buffalo St.
P.O. Box 411
Springville, NY 14141
(716) 592-2900

PRIVILEGE AND CONFIDENTIALITY NOTICE
The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.



EXHIBIT
D

4/21/2008

**From:** Michelle Teggelaar
**To:** 'Michael A. Benson'
**Sent:** 2/28/2008  11:37AM
**Subject:** RE: Sharp v. Tri-Financial

Mr. Benson -

As I told you on the phone, there is no debt to Discover listed on Ms. Sharp's credit report at all - not as a positive record, closed account, charge off, etc.  She does not recall ever having a debt to Discover.  A collector for Tri-fi indicated told her on the phone that it may be listed on her credit report as something called "Clerigy" - there is no such entry on her credit report.  (Nor was there one for "Credigy" if that is what was meant).  There is no outstanding debt in that amount owed to any entity listed on her credit report. There is no outstanding debt listed as previously owned by Discover.

Please provide us with the account number, charge off date, prior holder of the account, if an entity other than Discover, as perhaps this information could appear in reference to a different entry.  If it does not, it does not appear that this is a debt that Ms. Sharp owes.  I can confer with my client and send you a settlement demand, but it would faciliate matters if you could provide this information first, so we can at least determine if she owes the debt and would be interested in debt forgiveness as an aspect of any proposed settlement.

Michelle R. Teggelaar
Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle St., Suite 1800
Chicago, IL  60603
(312) 739-4200
(312) 419-0379 (fax)


-----Original Message-----
From: Michael A. Benson [mailto:bensonlaw1@verizon.net]
Sent: Thursday, February 28, 2008 11:02 AM
To: Michelle Teggelaar
Subject: Re: Sharp v. Tri-Financial

Ms. Teggelaar:

Virginia Sharp with an address of 16621 W.144th Place, Lockport IL 60441 with a SS# of Redacted owes Discover 427.31.

Kindly send a settlement Demand.


From: Michelle Teggelaar <MTEGGELAAR@edcombs.com>
Date: 2008/02/26 Tue AM 09:34:53 CST
To: bensonlaw1@verizon.net
Subject: Sharp v. Tri-Financial



EXHIBIT

E

**From:** Michelle Teggelaar
**To:** 'bensonlaw1@verizon.net'
**Sent:** 2/29/2008   8:26AM
**Subject:** FW: Activity in Case 1:08-cv-01002 Sharp v. Tri-Fi, LLC set deadlines/hearings

Please be advised that the Court entered a minute order today, which I am forwarding for your information.

---

From: usdc_ecf_ilnd@ilnd.uscourts.gov [mailto:usdc_ecf_ilnd@ilnd.uscourts.gov]
Sent: Friday, February 29, 2008 8:15 AM
To: ecfmail_ilnd@ilnd.uscourts.gov
Subject: Activity in Case 1:08-cv-01002 Sharp v. Tri-Fi, LLC set deadlines/hearings

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.

United States District Court

Northern District of Illinois - CM/ECF LIVE, Ver 3.0

Notice of Electronic Filing

The following transaction was entered on 2/29/2008 at 8:14 AM CST and filed on 2/29/2008

Case Name:    Sharp v. Tri-Fi, LLC
Case Number:   1:08-cv-1002 <http://ecf.ilnd.uscourts.gov/cgi-bin/DktRpt.pl?217250>
Filer:
Document Number:    9
<http://ecf.ilnd.uscourts.gov/cgi-bin/show_case_doc?9,217250,,30565530,,,27>

Docket Text:
MINUTE entry before Judge Amy J. St. Eve :Joint Status Report due by 3/26/2008. Initial Status hearing set for 3/31/2008 at 08:30 AM. in courtroom 1241.Mailed notice (tmh, )

1:08-cv-1002 Notice has been electronically mailed to:

Cathleen M. Combs      ccombs@edcombs.com

Daniel A. Edelman      courtecl@edcombs.com,dedelman@edcombs.com

James O. Latturner     jlatturner@edcombs.com

Michelle R. Teggelaar      mteggelaar@edcombs.com



LAW OFFICES OF
## EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
120 SOUTH LASALLE STREET
18TH FLOOR
CHICAGO, ILLINOIS 60603
312-739-4200
FAX 312-419-0379
WEBSITE www.edcombs.com
EMAIL edcombs@aol.com



March 6, 2008

*Via E-Mail and U.S. Mail*

Michael A. Benson
77 N. Buffalo St.
P.O. Box 411
Springville, NY 14141

> Re:  *Sharp v. Tri-Fi, LLC, No. 08 C 1002*

Dear Mr. Benson:

I am writing in response to your letter of March 4, 2008.  Ms. Sharp rejects the defendant's offer to settle the case for payment of            and forgiveness of the debt.

As I have informed you, Ms. Sharp disputes the debt, and to date you have been unable to provide any information to verify the debt.  Initially, you represented that it was a debt to Discover.  Neither Ms. Sharp nor her husband ever had a Discover account.  Then, you said that it was a debt to CNE Associates, which was a name used by Discover.  CNE Associates is certainly not a name used by Discover, nor does it appear to be any type of affiliated entity.  Neither Ms. Sharp nor her husband have ever heard of CNE Associates.  There is no entry on Ms. Sharp's credit report for Discover or CNE Associates.  There is no outstanding defaulted credit card debt on Ms. Sharp's credit report whatsoever.  There is no account of any type on Ms. Sharp's credit report showing a balance of $427.31.  In addition, you represented that the account number of this credit card account is 14991.  That is certainly not a sixteen digit credit card number, however, there is no listing on Ms. Sharp's credit report that contains the numbers 14991 as any portion of a credit card account number.

As I have told you on multiple occasions, unless the defendant can verify this debt and provide complete and accurate identification of the original creditor and account number, Ms. Sharp is not interested in a settlement proposal that includes debt forgiveness.  If this information can be provided and it appears that this was an account belonging to Ms. Sharp that was not previously paid or settled, she may reconsider.



Furthermore, Ms. Sharp is not interested in a settlement proposal that does not provide the relief provided for under the FDCPA for a plaintiff who prevails or who resolves the case through settlement, including attorney's fees. If the defendant wants to settle this case without retaining local counsel in Chicago, it cannot reasonably expect to reach an agreement until it is willing to pay reasonable attorney's fees.

If the defendant wishes to reconsider and provide Ms. Sharp with a revised proposal that includes attorney's fees and costs and actual damages for the embarrassment suffered by Ms. Sharp , resulting from the false threats of suit the defendant left on the general voicemail at her place of employment, and heard by her co-workers, please forward any such proposal to my attention. Otherwise, I have forwarded to you a copy of the minute order issued by Judge St. Eve, which requires the parties to submit a joint status report by March 26, 2008, in advance of the March 31, 2008 initial status. Please have your local counsel contact me so that we can discuss the contents of the report.

Sincerely,

Michelle R. Teggelaar

cc:     Virginia Sharp

Page -2-

## BILL OF SALE AND ASSIGNMENT

This BILL OF SALE AND ASSIGNMENT (this *"Assignment"*), dated as of January 3, 2008, is executed by **CREDIGY RECEIVABLES INC.**, a Nevada corporation (the *"Seller"*), in favor of **CNE ASSOCIATES, LLC**, a New York limited liability company (the *"Purchaser"*). Except as otherwise defined herein, all capitalized terms used in this Assignment shall have the respective meanings ascribed to such terms in that certain Purchase and Sale Agreement, dated as of January 2, 2008 (the *"Agreement"*), by and between the Seller and the Purchaser.

For value received and subject to the terms and conditions of the Agreement, the Seller hereby transfers, sells, assigns, conveys, grants, bargains, sets over and delivers to the Purchaser, and to the Purchaser's successors and assigns, all of the Seller's rights, title and interest in and to the Accounts and any claims arising out of the Accounts described in the Agreement and contained in the electronic file provided to the Purchaser on even date herewith.

This Assignment is executed without recourse and without representations or warranties including, without limitation, warranties as to collectibility, except as otherwise provided in the Agreement.

Seller:

**CREDIGY RECEIVABLES INC.**,
a Nevada corporation

By: _____
David Stach
Vice President and General Counsel

STATE OF GEORGIA          )
                          )     ss.
COUNTY OF FORSYTH         )

SUBSCRIBED AND SWORN to (or affirmed) before me on this 3rd day of January, 2008, by David Stach, Vice President and General Counsel of Credigy Receivables Inc., a Nevada corporation, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

WITNESS my hand and official seal.

Signature: _____

[EXHIBIT C TO PURCHASE AND SALE AGREEMENT]

EXHIBIT
H

## AFFIDAVIT OF JASON S. WILLIAMS AS RECORDS CUSTODIAN OF CREDIGY RECEIVABLES, INC.

BEFORE ME, the undersigned authority, on this day personally appeared JASON S. WILLIAMS, who swore on oath that the following facts are true:

My name is JASON S. WILLIAMS and I am over the age of eighteen years of sound mind, capable of making this affidavit, and I have personal knowledge of each of the matters state herein, as more specifically described herein.

1.      I am the custodian of the business records for Credigy Receivables Inc. (Credigy).  I am familiar with the contents of the business records of Credigy, the method by which those business records are maintained and the systems used to maintain those business records.  All of the business records referred to herein were kept by First Select, Inc., and/or Credigy in the regular course of business, and it was the regular course of business of First Select, Inc., and/or Credigy for an employee or representative of First Select, Inc., and/or Credigy with knowledge of the act, or event, to make the record or to transmit information thereof to be included in the record, and the record was made at or near the time or reasonably soon thereafter.  The records attached hereto are the original or exact duplicates of the originals, as more specifically described herein.

2.      On December 27, 2002 Credigy was the legal owner of the closed consumer credit card account originally requested by Debtor VIRGINIA SHARP,  (Debtor)  from Discover (the Original Creditor) and opened by the Original Creditor on August 1, 1996 as account number Redacted (the Account) at the request of Debtor.  On January 2, 2008, Credigy sold all of its right, title and interest in and to Debtor's Account to CNE Associates, LLC.

3.      Debtor's Account with the Original Creditor was governed by a set of written Terms and Conditions accepted by Debtor upon use of the Account.  An exemplary copy of the Original Creditor Terms and Conditions governing the Account is attached hereto and incorporated herein by reference as Exhibit A.  Among the terms and conditions were Debtor's agreement to pay promptly, on rendition of a statement, all charges on the Account, and to pay all reasonable costs of collection, including reasonable attorney's fees, if Debtor's Account was referred to an attorney for collection.

4.      Debtor accepted and used the credit card provided by the Original Creditor, and the Original Creditor rendered monthly statements of charges to Debtor.

5.      At the time the Account was opened by Debtor, the Original Creditor was a national banking association duly organized, validly existing, in good standing under the

laws of the United States and subject to regulatory oversight by the United States Department of the Treasury Office of the Comptroller of the Currency.

6.    Original Creditor maintained electronic data related to the Account in its system of record in the ordinary course of its business, including: (i) personally identifiable information identifying the Debtor as the individual obligated on the Account such as the Debtor's name, Social Security Number, current address and current phone number, (ii) information itemizing the amount of the last payment received and the date of that payment (iii) the current balance of the Account; (iv) the written terms and conditions related to the Account; (v) the interest rate applicable to the Account; (vi) the method used to calculate interest on the Account, (vii) the date the Account was opened; and (ix) a variety of similar data identifying material facts related to the Account.

7.    Any and all documents, statements or communications produced by Original Creditor related to the Account were produced solely from the electronic business records contained in the Original Creditor's system of record and thus were merely representations of electronic business records contained in Original Creditor's system of record.

8.    Debtor failed to make the regularly scheduled payment to the Original Creditor and thereafter failed to comply with the terms and conditions governing the Account. The Original Creditor made written demand on Debtor for the balance due and owing on the Account separate and apart from the statements rendered to Debtor, but Debtor failed and refused to pay. On June 30, 1999 the Original Creditor charged off the unpaid balance of the Account as uncollectible in accordance with its usual and customary banking practices and applicable federal regulations (which dictate that the time period between first delinquency on a consumer credit account and charge-off is no more than 180 days). The last payment made on the Account by the Debtor was made on December 7, 2001 in the amount of $100.00.

9.    On May 26, 1999 the Original Creditor entered a Receivables Sales Agreement with First Select, Inc. (First Select). Pursuant to the terms and conditions of this Receivables Sales Agreement First Select agreed to purchase, from time to time, charged off consumer credit card accounts from the Original Creditor. Upon each such sale, Original Creditor agreed to transfer all of its rights, title and interest in and to the accounts sold to First Select and delivered a Bill of Sale to First Select, along with the electronic business records identifying the accounts sold, the unpaid balances of those accounts and other material data related to the accounts from Original Creditor's system of record, including Debtor's Account.

10.    In addition, Original Creditor represented and warranted in the Receivables Sales Agreement that it had good and marketable title to each account sold to First Select, including Debtor's Account, and that each account sold to First Select, including Debtor's Account, had been originated, maintained and serviced in compliance with all applicable laws, including, without limitation, the Truth-in-Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Fair Credit Billing Act.

11. On July 31, 1999 during the term of the Receivables Sales Agreement the Original Creditor transferred and sold all of its right, title and interest in and to Debtor's Account to First Select subject to the representations and warranties of the Receivables Sales Agreement, as amended. At the time Debtor's Account was sold to First Select, it had an unpaid balance of $1503.81 and the default interest rate applicable to the Account was seven and 80/100 percent (7.80%) per annum compounded, accrued monthly using the average daily balance method.

12. After acquiring Debtor's Account, First Select transferred the electronic business records related to the Account provided by the Original Creditor to its system of record and thereafter maintained and supplemented those records with updated information in the ordinary course of its business. First Select assigned its own account number to Debtor's Account as a reference in addition to the Original account number assigned by the Original Creditor Redacted The account number assigned to Debtor's account by First Select was Redacted

13. Thereafter, First Select sent Debtor its own set of written terms and conditions which incorporated the material terms of the Original Creditor's applicable written terms and conditions, an exemplary copy of which is attached hereto and incorporated herein as Exhibit B. Thereafter, First Select attempted to collect the unpaid balance on the Account from Debtor and sent monthly statements of account to Debtor. Debtor did not make additional payments to First Select.

14. Any and all documents, statements or communications produced by First Select related to the Account were produced solely from the electronic business records contained in First Select's system of record and thus were merely representations of electronic business records contained in First Select's system of record, inclusive of the business records transferred by the Original Creditor to First Select.

15. On December 27, 2002, First Select entered a Purchase and Sale Agreement with Credigy Receivables Inc. for the purchase and sale of certain charged off consumer credit card accounts, including Debtor's Account. Pursuant to the terms and conditions of said Purchase and Sale Agreement, First Select transferred all of its right, title and interest in and to Debtor's Account to Credigy Receivables Inc. and delivered a Bill of Sale to Credigy Receivables Inc. dated December 30, 2002, a copy of which is attached hereto and incorporated herein as Exhibit C. First Select represented and warranted to Credigy Receivables Inc. that it had good and marketable title in and to Debtor's Account to Credigy Receivables Inc.

16. As part of the transfer of Debtor's Account to Credigy Receivables Inc., First Select transferred certain electronic business records to Credigy Receivables Inc. through a third party escrow agent, in encrypted electronic data files on Imation brand CD-R media serial numbers 5120GH011LH0100D4, 5120GH011LH0093D4, 5120GH011LH0095D4, 5120GG313LH0877D6 and Fujitsu brand CD-R media serial number 9G152K0185980, including certain of the electronic business records transferred to First Select by the Original Creditor, including: (i) the First Select account number assigned to Debtor's account; (ii) Debtor's First Name; (iii) Debtor's Last Name;

(iv) Debtor's complete address; (v) Debtor's home phone number; (vi) Debtor's work phone number; (vii) the current balance of Debtor's account; (viii) the charge off balance of Debtor's account; (ix) the charge off balance of Debtor's account; (x) the last payment amount made on Debtor's account; (xi) the date of the last payment on Debtor's account' (xii) Debtor's Social Security Number; (xiii) the interest applicable to Debtor's account; (xiv) the date Debtor's account was opened with the Original Creditor; (xv) the VISA account number assigned to Debtor's account by the Original Creditor; (xvi) records of all payment transactions related to Debtor's account processed by First Select; (xvii) the distribution history of Debtor's account; (xviii) customer service notes related to Debtor's accounts; and (xix) a variety of similar data identifying material facts related to the Account. The data contained on the Master Disk was represented and warranted by First Select to be a true, accurate and complete listing, in all material respects, of the information related to the accounts sold to Credigy Receivables Inc., including Debtor's Account.

17.    Any and all documents, statements or communications produced by Credigy Receivables Inc. related to the Account were produced solely from the electronic business records contained in Credigy Receivables' system of record and thus were merely representations of electronic business records contained in Credigy Receivables' system of record.

Jason S. Williams
Affiant

Sworn to and subscribed before me, the
undersigned authority, this _14th_ day of
_March_ , 20_08_.

Notary Public
State of Georgia

My Commission Expires:
_11/13/2009_

*Unredacted.*

## AMENDED AND RESTATED CREDIT CARD ACCOUNTS SALE AGREEMENT

This Amended and Restated Credit Card Accounts Sale Agreement (the "Agreement") is made and entered into this October 1, 2001 by and between First Select, Inc. ("Buyer") and Discover Bank f/k/a Greenwood Trust Company ("Seller"). First Select Corporation ("FSC"), a Delaware corporation and an affiliate of Buyer and Seller entered into a Credit Card Accounts Sale Agreement, effective May 26, 1999, as amended by a November 22, 1999 Amendment 1 to Credit Card Accounts Sale Agreement, a January 25, 2000 Amendment 2 to Credit Card Accounts Sale Agreement, an April 28, 2000 Third Amendment to Credit Card Accounts Sale Agreement, a September 27, 2000 Fourth Amendment to Credit Card Accounts Sale Agreement and an October 31, 2000 Fifth Amendment to Credit Card Accounts Sale Agreement (collectively the "May 26, 1999 Agreement"). Buyer shall hereinafter be substituted for FSC.

### WITNESSETH

WHEREAS, Buyer and Seller desire to restate and further amend the terms of the May 26, 1999 Agreement.

NOW, THEREFORE, Seller and Buyer agree, on the terms and conditions herein set forth, as follows:

## ARTICLE I
## DEFINITIONS

1.1 "Account" means each unsecured consumer credit card account (a) which is owned by Seller, (b) which is described on an Account Schedule, and (c) which has been charged off by Seller as a loss.

1.2 "Account Schedule" means, with respect to any Closing Date, the electronic files which will be delivered to Buyer, setting forth all of the Accounts which Seller has elected to sell Buyer and which Buyer has agreed to purchase that month and shall contain for each Account the data fields listed on the attached Exhibit A, to the extent such data is available.

1.3 "Account Statement" means any billing statement in the Seller's possession which relates to an Account and was issued within the twelve (12) months preceding the applicable Closing Date for an Account or, for those Accounts which do not have activity within the twelve (12) months preceding the applicable Closing Date, a billing statement which comprises one of the most recent twelve (12) months of billing statements for an Account; provided, however, that in no event shall the term include billing statements prior to November, 1992.

1.4 "Agreement" means this Credit Card Accounts Sale Agreement, as the same may be amended or supplemented from time to time.

1.5 "Business Day" means any day except Saturday, Sunday or other day on which banking institutions in Delaware or Illinois are authorized or required by law or

1

executive order to close.

1.6   "Closing Date" means three (3) Business Days after the Cut-off Date with respect to any purchase.

1.7   "Credit Files" shall have the meaning set forth in Paragraph 4.2 hereof.

1.8   "Cut-off Date" means the close of business on the day Seller notifies Buyer of the Accounts to be sold to Buyer in accordance with Paragraph 3.3(b).

1.9   "Debtor" means any obligor for, or guarantor or surety of, or any party liable for, the performance of an Account.

1.10   "Effective Date" means October 1, 2001.

1.11   "Litigation Account" means any Account which, as of the applicable Closing Date, is the subject of litigation or any collection agency agreement.

1.12   "Purchase Price" means ▓▓▓▓ times the Unpaid Balance for each Account.

1.13   "Transfer Date" means three (3) Business Days after Seller's receipt of the Purchase Price with respect to any purchase.

1.14   "Repurchaseable Account" means, as of the applicable Cut-off Date for each Account purchased, (a) an Account with reference to which a final judgment has been entered by a court of competent jurisdiction to the effect that no Debtor on the Account is under any enforceable obligation to pay the holder of the Account, and that the holder of the Account shall take no action against any and all Debtors executing Account documentation; (b) an Account in which Seller or a predecessor in interest released all Debtors obligated on the Account from any liability on the Account; (c) an Account with respect to which all of the Debtors on the Account have filed bankruptcy and the bankruptcy has not been dismissed prior to the applicable Cut-off Date, notwithstanding that a Repurchaseable Account shall also mean an Account in which a Debtor on an Account has filed bankruptcy (and the bankruptcy has not been dismissed prior to the applicable Cut-off Date) in a state that provides all other Debtors on the Account an automatic stay of relief; (d) an Account with respect to which all Debtors on the Account were deceased; (e) an Account for which the actual listed Debtor claims, through a statement in writing, that he or she did not open the Account or that the Account was fraudulently opened, used, lost or stolen; (f) ) an Account with respect to which the Debtor, prior to the Cut-off Date, has a billing address located outside the continental United States; (g) an Account with respect to which Seller charged off thirty (90) or more days prior to the Cut-off Date; (h) an Account which has a Debtor who is subject to a garnishment order or any court-ordered judgment or lien against the Debtor or the Debtor's property, as a result of Seller's claim against the Debtor for the Unpaid Balance on the Account; (i) an Account which does not meet the definition of Account as provided for in Paragraph 1.1; or (j) an Account that was re-aged (1) more than one time in any twelve

(12) consecutive month period, (2) prior to receipt of less than the equivalent of three (3) monthly payments or (c) in a manner that was not in compliance with applicable regulatory aging requirements at the time of the re-age.

1.15   "Unpaid Balance" means the approximate outstanding amount of the Account as of the applicable Cut-off Date which will be specified as either the current balance or current principal balance. This figure may include interest (accrued or unaccrued), costs, fees, and expenses incurred prior to charge-off. It is possible that payments have been made by or on behalf of any Debtor prior to the applicable Cut-Off Dates, which are not reflected in the Unpaid Balance. This figure may reflect payments made by or on behalf of any Debtor which have been deposited and credited to the Unpaid Balance of such Account, but which may subsequently be returned to Seller due to insufficient funds to cover such payments.

1.16   "UCC" means Uniform Commercial Code as in effect in the applicable jurisdiction.

1.17   "UCC Financing Statement" means, with respect to the Seller, a UCC financing statement, with a Schedule I attachment in the form of Exhibit B to this Agreement, and with respect to the Buyer, a UCC financing statement, with a Schedule I attachment in the form of Exhibit C to this Agreement, filed in the appropriate jurisdictions with respect to the Seller and Buyer.

## ARTICLE II
## PURCHASE AND SALE OF ACCOUNTS

2.1   Agreement to Sell and Purchase Accounts. Seller shall sell and Buyer shall buy all of Seller's right, title, and interest in and to the Accounts which Seller identifies during each month through December, 2002, subject to the terms, conditions, limitations, waivers and disclaimers set forth in this Agreement. The aggregate Unpaid Balance of Accounts to be sold to Buyer in any month shall not be less than thirty five million dollars ($35,000,000) and not more than fifty million dollars ($50,000,000). In the event Seller desires to sell in excess of fifty million dollars ($50,000,000) of Unpaid Balance of Accounts in any month under this Agreement, Seller shall provide written notification to Buyer of the amount of such excess and Buyer may elect to purchase such excess amounts by delivery of its written consent to Seller.

Seller shall not use any selection procedures to identify Accounts, from the outstanding aggregate of charged-off accounts available for sale by Seller, which will result in a material adverse selection of Accounts to Buyer. Seller shall notify Buyer in writing at least thirty (30) days prior to any sale of Accounts of any material change to Seller's collection practices that is reasonably likely to have a material adverse affect on Buyer's collection of such Accounts after the sale of the Accounts. Buyer shall have five (5) Business Days from receipt of such notice to notify Seller that Buyer elects not to purchase such Accounts during any such month.

This Agreement shall automatically renew for a one (1) year period, through December,

3

2003, unless terminated by either party upon at least ninety (90) days written notice to the other party prior to December 31, 2002.

2.2    Bill of Sale/Buyer's Right to Act. Seller shall deliver to Buyer, within forty-five (45) days after the Closing Dates, Bills of Sale in the form of Exhibit D hereto, executed by an authorized representative of Seller, which Bills of Sale shall reflect, as of the Closing Date, the sale, transfer, assignment, set-over, quitclaim and conveyance to Buyer of all right, title and interest of Seller in and to (i) each of the Accounts, and (ii) the proceeds of the Accounts received by Seller after the applicable Cut-Off Date, if any; subject to Article V. In the event Seller fails to deliver any Bill of Sale hereunder, this Paragraph 2.2, the applicable Account Schedule and proof of payment, shall constitute the evidence that all right, title and interest in the applicable Accounts listed on the Account Schedule, have been conveyed to the Buyer as of the applicable Closing Date. On or before the initial Transfer Date, Seller shall also deliver to Buyer a UCC Financing Statement. Buyer shall have no right to communicate with any Debtor or otherwise take any action with respect to any Account or any Debtor until after the Closing Date.

## ARTICLE III
## PURCHASE PRICE AND PAYMENT

3.1    Purchase Price. The purchase price of the Accounts purchased hereunder by Buyer shall be as set forth in Paragraph 1.12.

3.2    Accounts Excluded. If Seller excludes any Account from a sale prior to the applicable Closing Date pursuant to Paragraph 11.1, the total Purchase Price to be paid by Buyer shall be reduced by the amount of the cumulative Purchase Price for all excluded Accounts.

3.3    Identification and Payment. Seller shall notify Buyer, on or about the 20th day of each month hereunder of the total Unpaid Balance and Purchase Price of the Accounts identified by Seller and to be purchased by Buyer for that month. Buyer shall pay for the identified Accounts on each applicable Closing Date. All such funds shall be in immediately available funds in United States Dollars by wire transfer to Seller in accordance with the wire transfer instructions provided to Buyer.

3.4    Adjustments to Purchase Price. Within fifteen (15) days after the applicable Transfer Date or the date Buyer receives the Account Schedule, Buyer shall notify Seller of any adjustments to the Purchase Price due to miscalculations of interest and principal, misapplied payments, unapplied payments and accounting errors. If the Purchase Price, as adjusted, is greater than the Purchase Price previously paid by Buyer, Buyer shall pay the amount of such deficiency after Buyer notifies Seller of any such adjustment to the Purchase Price, no later than the Closing Date in the next subsequent month, and if there are no Accounts sold in any such subsequent month, then, within fifteen (15) Business days after Buyer notifies Seller of any adjustment to the Purchase Price. If the Purchase Price, as adjusted, is less than the Purchase Price paid by Buyer, Seller shall, at Buyer's election, either (i) refund to Buyer the excess amount paid by Buyer out of the proceeds of

the sale received by Seller within fifteen (15) days after Buyer notifies Seller of the adjustment to the Purchase Price or (ii) deduct the excess amount paid by Buyer from the Purchase Price to be paid by Buyer for Accounts purchased on the next Closing Date.

3.5    **Default by Buyer.**  If Buyer fails or refuses to purchase any portion of the Unpaid Balance of Accounts as outlined in Paragraph 2.1 above, prior to or on any Closing Date, or fails to perform any of Buyer's other obligations hereunder either prior to or on any Closing Date for any reason, then Seller shall have the right to (i) enforce specific performance of Buyer's obligations under this Agreement and/or (ii) exercise any other right or remedy Seller may have at law or in equity by reason of the default, including but not limited to, reselling any unpurchased Accounts and seeking any deficiency against Buyer and the recovery of attorney's fees incurred by Seller in connection with Buyer's default.

3.6    **Default by Seller.**  If Seller fails or refuses to sell any portion of the Unpaid Balance of Accounts as outlined in Paragraph 2.1 above, prior to or on any Closing Date, or fails to perform any of Seller's other obligations hereunder either prior to or on any Closing Date for any reason, then Buyer shall have the right to exercise any right or remedy Buyer may have at law or in equity by reason of the default, including but not limited to, recovery of attorney's fees incurred by Buyer in connection with Seller's default.

ARTICLE IV

TRANSFER

4.1    **Delivery and Transfer.** Seller shall use its best efforts to deliver a materially problem-free preliminary account schedule and sale invoice on each Cut-off Date. The preliminary account schedule shall contain information to be set forth in the Account Schedule, including the date of Debtor's first delinquency, except that it shall omit Account numbers. If there is any material data integrity problem with any preliminary account schedule, the Closing Date shall be two (2) Business Days after Buyer's receipt of a corrected preliminary account schedule.

Seller shall use its best efforts to deliver to Buyer, on the applicable Transfer Date, a materially problem-free Account Schedule relating to the Accounts purchased by Buyer, provided that , if Seller encounters mechanical difficulties that make it impossible to deliver an Account Schedule on a Transfer Date, Seller shall provide Buyer a statement of evidence for the reason for such difficulty, and shall use its best efforts to deliver the Account Schedule to Buyer as soon as practicable, but no later than five (5) Business Days after the applicable Closing Date. In the event Buyer discovers any material problem with the data integrity of any Account Schedule, Buyer shall immediately notify Seller of such problem, and Seller shall use its best efforts to deliver a materially problem-free Account Schedule to Buyer as soon as practical. Seller may change the layout of the Account Schedule with at least thirty (30) days advance written notice (or such other shorter time as the parties may agree) to Buyer of such change.

If Seller is unable to deliver the Account Schedule in a materially problem-free electronic file within five (5) Business Days after the scheduled Transfer Date as defined in

5

Paragraph 1.13 of the Agreement, Buyer and Seller agree to renegotiate in good faith the Purchase Price for such Accounts; provided however that Buyer shall not be obligated to purchase such Accounts if Buyer and Seller cannot agree to a new Purchase Price for such Accounts, and Seller shall refund any Purchase Price paid within fifteen (15) days from the termination of said negotiations.

4.2     Transfer of Documents.  Seller shall deliver to Buyer copies of the credit applications, affidavits in the form of Exhibit E to this Agreement, or up to three (3) consecutive months of Account Statements, but not all three ("Credit Files") for fifteen percent (15%) of the total number of Accounts sold to Buyer. Within one hundred eighty (180) days after the applicable Closing Date, Buyer shall deliver to Seller a list of Accounts for which Seller will deliver Credit Files. Said list(s) shall be provided on an Application, Statement or Affidavit Request Form, as provided in Exhibits F-1 through F-3 to this Agreement and shall specify which type of Credit File Buyer requests.  Seller shall have from receipt of Buyer's request, sixty (60) days to deliver credit applications, forty-five (45) days to deliver Account Statements and ten (10) Business Days to deliver affidavits.

Seller shall deliver to Buyer additional copies of Credit Files for the Accounts referenced above in this Paragraph 4.2, or copies of Credit Files for the remaining eighty five percent (85%) of the Accounts, upon receipt of payment of seven dollars fifty cents ($ 7.50) for each Credit File requested by Buyer.  Within two hundred seventy (270) days after the applicable Closing Date, Buyer shall deliver to Seller a list of Accounts for which Seller shall deliver copies of the Credit Files, provided; however, such requests shall not exceed 1,000 copies per month, and such requests shall not exceed 500 copies every two (2) weeks from the applicable Transfer Dates. Seller shall have from receipt of Buyer's request, sixty (60) days to deliver credit applications, forty-five (45) days to deliver Account Statements and ten (10) Business Days to deliver affidavits. Seller shall make available to Buyer during reasonable business hours, an employee who is knowledgeable about the Credit Files and who can respond to Buyer's questions about the Credit Files. Buyer acknowledges that such employee shall not be exclusively dedicated to Buyer to provide the aforementioned services.

If any documents relating to the Accounts are requested or demanded from Seller by subpoena, Buyer shall be responsible for paying the fees set forth as applicable to the remaining eighty five percent (85)% of the Accounts in the preceding subparagraph prior to Seller's fulfillment of any such demand or request.

Seller's failure to provide Credit Files in accordance with this Article IV, shall not constitute a material breach of this Agreement, provided, Seller has made a good faith effort to locate such Credit Files.

4.3     Other Documents.  Subject to the requirements and limitations set forth in this Agreement, Seller agrees, to the extent required by applicable laws, statutes, rules and regulations of all federal, state, local, governmental, or quasi-governmental entities or authorities having jurisdiction, to complete and execute any documents and to take such other actions as are reasonably necessary or appropriate to effectuate this Agreement, and

6

only for the purposes of effectuating this Agreement. This provision shall also not be construed to require Seller to execute or otherwise deliver a UCC financing statement in connection with the sale of Accounts under this Agreement except as provided in Paragraph 2.2. Notwithstanding the aforementioned, Buyer agrees that neither it, nor its administrators, representatives, successors and assigns shall file or cause to be filed any UCC financing statement or other documents evidencing the sale, with any public filing agency, including but not limited to, any county recorder's or secretary of state's office without the prior written consent of Seller, which consent shall not unreasonably be withheld.

## ARTICLE V
## PAYMENTS AFTER CUT-OFF DATE

5.1    **Payments.** Except as provided below in this Paragraph 5.1, all payments received by Seller from Debtors on Accounts after the applicable Cut-off Date, shall belong to Buyer and notice thereof shall be forwarded by Seller to Buyer within fifteen days after receipt of said payments. Seller's notice of payments received after the applicable Cut-off Date shall specify the amount and the posting date for each payment. Seller shall forward to Buyer a check in the amount of such payments within thirty (30) days after Seller's receipt of said payments. Any payment received by the Buyer for which the Debtor's payment was subsequently deemed insufficient, shall be returned by Buyer to Seller within fifteen (15) days of notice of such insufficiency.

Seller shall retain the right to collect on any and all checks, or other negotiable instruments, which represent payments of principal, interest, or any other fees or charges under any of the Accounts that are purchased hereunder received by Seller prior to and including the applicable Cut-off Date, regardless of whether the checks or other negotiable instruments are collected, prior to, or subsequent to the applicable Cut-off Date.

Buyer shall pay Seller a $7.50 service charge for each payment forwarded to Buyer on any Account, which was received by Seller after nine (9) months of an applicable Closing Date.

5.2    **Pending Legal Proceedings.** Any Litigation Account which is identified by Buyer as such within one hundred eighty (180) days of the applicable Closing Date, shall be repurchased or substituted by Seller pursuant to the terms of Article IX, provided Buyer notifies Seller within ten (10) days after Buyer identifies any such Litigation Account during the aforementioned one hundred eighty (180) day period. In the event Buyer fails to notify Seller of any such Litigation Accounts, Buyer shall, to the extent applicable, at its own cost, (i) notify the Clerk of the Court, any trustee and all counsel of record in each such proceeding of the transfer of the Account from Seller to Buyer, (ii) file pleadings to relieve Seller's counsel of record from further responsibility in such litigation (unless said counsel has agreed, with Seller's written consent, to represent Buyer in said proceedings at Buyer's expense), and (iii) remove Seller as a party in such action and substitute Buyer as the real party-in-interest, and change the caption thereof accordingly. In connection therewith, Buyer shall have the sole responsibility to determine the appropriate direction and strategy

for such litigation or proceeding. If Buyer fails to comply with the above requirements (i-)-(iii), Seller may, but is not obligated to take such actions as it deems necessary to effectuate the provisions of this Paragraph. Buyer acknowledges that its failure to comply with the provisions of this Paragraph may affect Buyer's rights in any such litigation or proceeding including, without limitation, any dismissal with prejudice or the running of any statute of limitations if any such action or proceeding is dismissed. Buyer shall reimburse and indemnify Seller for any costs and legal fees incurred by Seller in connection with such proceeding after the applicable Closing Date, including, without limitation, any fees and costs incurred by Seller in connection with Buyer's failure to comply with the above requirements (i)-(iii). Seller shall deliver notice to Buyer of any legal fees and costs billed to Seller or incurred in connection with such proceeding after the applicable Closing Date, whereupon Buyer shall reimburse Seller for amounts so incurred.

Buyer shall notify Seller immediately in the event a claim, counterclaim or cross-claim is brought or threatened against Seller in any litigation or bankruptcy involving an Account.

## ARTICLE VI
## SERVICING OF THE ACCOUNTS

6.1  **Servicing After Applicable Closing Date.**  The Accounts shall be sold and conveyed to Buyer on a servicing-released basis. As of the applicable Closing Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of the Accounts, shall pass to Buyer, and Seller and/or its servicing agents, shall be discharged from all liability relating thereto. Seller and/or its servicing agents, shall have no obligation to perform any servicing activities with respect to the Accounts from and after the applicable Closing Date, except those required by law.

6.2  **Interim Servicing/Buyer Bound.**  Between the Effective Date and the applicable Closing Date, Seller or any servicing agents, shall continue to service the Accounts in accordance with Seller's servicing policies and procedures. Buyer shall be bound by the actions taken by Seller or any servicing agents, prior to the applicable Closing Date. Buyer shall take no action to communicate with any Debtor or enforce or otherwise service or manage the Accounts until the applicable Closing Date. Seller or any servicing agents, shall not be responsible for the failure to meet or toll any proof of claim, discharge, limitation, notice, hearing, trial, penalty or payment date or any other deadline in connection with an Account after the date of this Agreement. In no event shall Buyer be deemed a third party beneficiary of any servicing contract or agreement between Seller and any servicing agents, and in no event shall Seller or any servicing agents, be deemed a fiduciary for the benefit of Buyer with respect to the Accounts. Subject to the provisions hereof, Seller shall indemnify Buyer against and hold Buyer harmless from any and all claims, lawsuits or judgments against Buyer arising out of the gross negligence or willful failure by Seller or any servicing agents to provide the interim servicing hereunder, provided, however, that Seller shall not be required to indemnify Buyer or to hold Buyer harmless to the extent that such losses are caused in whole or in part by Buyer's actions or inactions.

8

6.3 **Servicer Requirements.** Buyer shall be responsible for complying with all state and federal laws, if any, with respect to the ownership and/or servicing of any of the Accounts from and after the applicable Closing Date including, without limitation, the obligation to notify any Debtor of the transfer of the Account and the servicing rights from Seller or its servicing agents to Buyer.

## ARTICLE VII
## SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

7.1 **Representations, Warranties and Covenants as to Seller.** Seller hereby represents and warrants that, as of the Effective Date and as of each applicable Closing Date:

(i) Seller is a bank, duly organized, validly existing and in good standing under the laws of the State of Delaware, with full power and authority to enter into this Agreement, to sell the Accounts and to carry out the terms and provisions hereof;

(ii) Seller has taken all necessary action to authorize its execution, delivery and performance of this Agreement and has the power and authority to execute, deliver and perform this Agreement and all the transactions contemplated hereby;

(iii) This Agreement and all the obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law);

7.2 **Representations, Warranties and Covenants of Seller as to Each Account.** Seller represents and warrants that, as to each Account sold or to be sold hereunder, as of the applicable Closing Date:

(i) Seller has good, valid and marketable title to the Accounts free and clear of all liens and encumbrances, except as may be imposed by Buyer or any of their respective assignees or transferees;

(ii) The Accounts were originated and/or have been maintained and serviced by the Seller in compliance with state and federal laws, including, without limitation, the Truth-In-Lending Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Fair Credit Billing Act;

9

    (iii)   Seller has full right and authority to sell and assign its interest in each Account; and

    (iv)   The Accounts are governed by the forms of cardholder agreements set forth in Exhibit G, as such forms may be amended, modified or changed from time to time (or a form of cardholder agreement substantially similar to the forms of cardholder agreements set forth in Exhibit G), which generally set forth the payment terms, finance charges and other arrangements pertaining to the Accounts.

    7.3   Indemnification. Seller agrees to indemnify Buyer and to hold Buyer harmless from and against any and all claims, demands, losses, damages, penalties, fines, forfeitures, judgments, legal fees and other costs, fees and expenses hereafter incurred by Buyer as a result of (i) any breach by Seller of the aforesaid warranties and representations; or (ii) any acts and/or omissions by Seller resulting in any claim, demand or assertion that Seller, prior to the applicable Closing Date, was in any way involved in, or had in any way authorized any unlawful collection practices in connection with any of the Accounts. Buyer agrees to notify Seller within ten (10) Business Days of notice or knowledge of any such claim, demand or assertion.

## ARTICLE VIII
## BUYER'S REPRESENTATIONS AND WARRANTIES

    8.1   Decision to Purchase and Economic Risk. Buyer represents, warrants and certifies to Seller that it is an institutional and sophisticated purchaser in the business of buying or originating accounts of the type sold hereunder or that otherwise deals in such accounts in the ordinary course of Buyer's business. Buyer further represents, warrants and certifies that it has knowledge and experience in financial and business matters that enables it to evaluate the merits and risks of the transaction contemplated by this Agreement, and that its bid and decision to purchase the Accounts are based upon Buyer's independent evaluation of the transaction. Buyer acknowledges that the Accounts may have limited or no liquidity and Buyer has the financial wherewithal to own the Accounts for an indefinite period of time and to bear the economic risk of an outright purchase of the Accounts and a total loss of the Purchase Price for the Accounts. Buyer acknowledges that it has not relied in entering into this Agreement upon any oral or written information provided by Seller or Seller's agents, representatives, or independent contractors, and acknowledges that no employee, agent, representative or independent contractor of the Seller has been authorized to make any statements or representations other than those specifically contained in this Agreement. Buyer has made such independent investigation as it deems warranted into the nature, validity, enforceability, collectability and value of the Accounts and all other facts it deems material to its purchase, and is entering into this transaction solely on the basis of that investigation and Buyer's own judgment.

    8.2   Covenant of Buyer. Buyer represents, warrants and certifies to Seller that the transactions contemplated by this Agreement do not involve, nor are they intended in any way to constitute the sale of "securities" within the meaning of any applicable securities laws, and none of the representations, warranties or agreements of Buyer shall create any inference that the

transactions involve any "securities."

8.3    Legal Compliance. Buyer represents, warrants and certifies to Seller that it will comply with all federal, state, county and local laws, regulations, ordinances and codes, (including the procurement of any required licenses, if applicable), in connection with the Accounts transferred to Buyer pursuant to this Agreement and the performance of its obligations under this Agreement, including without limitation, any laws, regulations, ordinances and codes, relating to (i) income tax reporting, (ii) credit information reporting in relation to the Accounts (including The Fair Credit Reporting Act), (iii) debt collection practices, (iv) bankruptcy and (v) the ownership and servicing of Accounts after the applicable Closing Date.  Buyer represents, warrants and certifies to Seller that it will comply with any legal obligation to notify Debtors of the transfer of Accounts and the servicing rights from Seller and/or any servicing agent to Buyer. Buyer further represents, warrants and certifies to Seller that it shall not bring or threaten to bring any legal proceeding against any Debtor in an effort to collect a debt, which is barred by any applicable statute of limitations.

8.4    Use of Names and Trademarks.  Buyer represents, warrants and certifies to Seller that it will not institute any legal action in the name of Seller or continue to prosecute or defend in the name of Seller any pending legal action; nor shall Buyer intentionally or unintentionally, through misrepresentation or nondisclosure, mislead any person as to, or conceal from any person, the identity of the buyer of the Accounts purchased pursuant to this Agreement; NOR SHALL BUYER USE OR REFER TO THE NAME OF GREENWOOD TRUST COMPANY, DISCOVER BANK, DISCOVER, DISCOVER CARD, DISCOVER PLATINUM, DISCOVER FINANCIAL SERVICES, INC., PRIVATE ISSUE, BRAVO, NOVUS SERVICES, INC., NOVUS CREDIT SERVICES INC., SCFC RECEIVABLES CORP. OR ANY NAME DERIVED THEREFROM OR SIMILAR THEREWITH TO PROMOTE BUYER'S MARKETING, ADVERTISING, SALE OR TRANSFER OF ANY ACCOUNT OR THE COLLECTION OR MANAGEMENT THEREOF; provided, however, that nothing in this Agreement herein shall be deemed to preclude Buyer from disclosing to Debtors, credit reporting agencies or potential transferees of the Accounts that Accounts hereunder were acquired from Seller.

8.5    Authority. Buyer represents, warrants and certifies to Seller that it is authorized to enter into this Agreement, that it has complied with all laws, rules, regulations, charter provisions and bylaws or other governance documents to which it may be subject, and that the undersigned representative is authorized to act on behalf of and bind Buyer to the terms of this Agreement.

8.6    Resale by Buyer. Buyer represents, warrants and certifies to Seller that it shall remain liable to Seller for the performance of the duties and obligations of Buyer under this Agreement if Buyer resells any Accounts purchased hereunder to any subsequent buyer. If Buyer resells any Accounts to any subsequent buyer, Buyer agrees to contractually require in writing that said buyer will comply with the material terms of Paragraphs 8.3, 8.4, 8.6 and 13.11. Buyer agrees to use diligent efforts to (i) require any subsequent buyer of Accounts, pursuant to a written contract, to comply with the material terms of Article 11 of the Agreement and (ii) obtain the reassignment of any Account for which Seller requests reassignment under Paragraph 11.1 of the Agreement if Buyer has subsequently sold such Account to a subsequent buyer. Buyer shall notify Seller promptly of the identity of any subsequent buyer of Accounts each time Buyer resells Accounts to any subsequent buyer and each time any subsequent buyer resells

Accounts, provided Buyer has such knowledge. Seller acknowledges that Buyer may own Accounts, as of the Effective Date of this Agreement, which were purchased by Buyer under the May 26, 1999 Agreement. Seller acknowledges and agrees that any resale of such Accounts shall be governed by Paragraph 8.6 of this Agreement and not Paragraph 8.6 of the May 26, 1999 Agreement.

8.7    **Enforceability.** Buyer represents, warrants and certifies to Seller that this Agreement and all of the obligations of Buyer hereunder are the legal, valid and binding obligations of Buyer, enforceable in accordance with the terms of this Agreement, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights.

8.8    **Notification to Credit Reporting Agencies.** Buyer represents, warrants and certifies to Seller that after the applicable Transfer Date, Buyer shall not file any report with any credit reporting agency using the account number assigned to the Account by Seller, except as may be required by a credit reporting agency for identification purposes only. Furthermore, Buyer represents and warrants that in the event it sells, assigns or transfers ownership of any Account purchased hereunder that it will report the sale of such Account to credit reporting agencies as may be required by law. If Buyer reports any information to a credit bureau, including, but not limited to, any information provided by Seller, Buyer warrants, represents and agrees that it will comply with all applicable federal, state, county and local laws, ordinances, codes and regulations, including, but not limited to the Fair Credit Reporting Act, in reporting such information. Seller shall report to each credit bureau with which it regularly does business the sale of the Accounts and may at its sole discretion, after the applicable Closing Date, delete its entry with said credit bureaus.

8.9    **Other Interests.** Buyer represents, warrants and certifies to Seller that to the best of Buyer's knowledge, none of Seller's employees have any personal interest, direct or indirect, in the Accounts sold hereunder other than an employee that may be a cardmember of Seller or a stockholder of Seller's parent, Morgan Stanley Dean Witter and Co. in the ordinary course of business.

8.11    **Insurance.** Buyer represents, warrants and certifies to Seller that Buyer shall maintain, at its own expense, throughout the term of this Agreement, the following levels of insurance coverage: (i) General liability insurance to cover bodily injury, property damage and personal injuries with limits of not less than $1,000,000.00 per occurrence; (2) Errors and omissions insurance with a minimum of $1,000,000.00 covering Buyer's managers and employees and other persons acting on its behalf with respect to the Accounts. Prior to the Initial Purchase, Buyer shall furnish Seller with insurance certificate(s) from its insurers indicating the amount of insurance coverage, the nature of such coverage and the expiration date of each applicable policy. In the event of any material change or cancellation of such policies, Buyer shall provide Seller at least thirty (30) days' prior written notice.

8.12    **Litigation.** Buyer represents, warrants and certifies to Seller that it shall advise Seller promptly, in reasonable detail, of any litigation or public proceeding, other than in which Buyer may be a plaintiff or claimant (i) affecting Buyer or any of its affiliates which may be likely to have a material adverse effect on the business, operations, properties, assets or financial condition of Buyer, (ii) affecting Buyer, its parent or any of its subsidiaries which arises out of or

12

is related to any of Buyer's collection activities or alleges a violation of the Federal Consumer Credit Protection Act, the Fair Credit Reporting Act, the Federal Trade Commission Act, the Fair Debt Collection Practices Act, any state debt collection laws, any state consumer protection laws or any state fair trade practices law or (iii) in which a claim has been filed against Buyer or any of its affiliates which arises out of or is related to any of Buyer's collection activities by any attorney general, state attorney or county attorney.

8.13 **Notice of Bankruptcies.** Buyer represents, warrants and certifies to Seller that whenever Seller forwards written notice to Buyer that any Debtor has filed for bankruptcy, Buyer shall, within two (2) Business Days, sign and return such written notice via facsimile to Seller acknowledging receipt of said notice. Any written notice regarding any bankruptcy filing shall be forwarded by Seller to Buyer via the transmittal form which is attached hereto as Exhibit H.

## ARTICLE IX
## BUYER'S RIGHT TO REFUND OR SUBSTITUTE

9.1 **Repurchaseable Account.** Buyer shall, within one hundred eighty (180) days from the applicable Closing Date for each Account and each substitute Account provided to Buyer pursuant to this Paragraph 9.1, notify Seller of each Account which Buyer seeks Seller to repurchase and shall supply Seller with evidence, satisfactory to Seller, that same is a Repurchaseable Account or Litigation Account. Seller shall notify Buyer within thirty (30) days of receipt of any notice from Buyer with respect to Accounts which Buyer seeks to have Seller repurchase, if Seller determines such Accounts are not supported by evidence satisfactory to Seller that same are Repurchaseable Accounts or Litigation Accounts. Seller shall either (i) refund to Buyer, on the terms and conditions set forth in this Article IX, the amount paid for each Repurchaseable Account or Litigation Account or (ii) deduct the Purchase Price paid by Buyer for such Repurchaseable Accounts and Litigation Accounts from the Purchase Price to be paid by Buyer for Accounts purchased on a subsequent Closing Date; provided, however, that if there is no subsequent Closing Date in a subsequent month, Seller shall, substitute each Repurchaseable Account and Litigation Account with an Account of equal or greater Unpaid Balance and with a similar or more recent charge-off date. Buyer shall deliver all Repurchaseable Accounts and Litigation Accounts, together with all related Credit Files (to the extent Seller had previously provided any related Credit Files to Buyer) to Seller. Seller shall pay the refund price, deduct the Purchase Price paid by Buyer for Repurchaseable Accounts and Litigation Accounts from the Purchase Price to be paid by Buyer for Accounts purchased on a subsequent Closing Date or substitute Repurchaseable Accounts and Litigation Accounts with Accounts of equal or greater Unpaid Balance and with a similar or more recent charge-off date, if there is no subsequent Closing Date in a subsequent month, within sixty (60) days from receipt of evidence, satisfactory to Seller, that same is a Repurchaseable Account or Litigation Account. Buyer shall endorse and/or reassign any repurchaseable Accounts and Litigation Accounts to Seller prior to Buyer's receipt of the repurchase price, a deduction of the Purchase Price for Accounts purchased on a subsequent Closing Date or a substitution of Accounts. Upon endorsement and/or reassignment of the Repurchaseable Accounts and Litigation Accounts to Seller and subject to Buyer's receipt from Seller of good, valid and marketable title to the Repurchaseable and Litigation Accounts pursuant to Paragraph 7.2

13·

(i) above, Buyer represents and warrants, as of the date Buyer reassigns such Accounts, Buyer has good, valid and marketable title to the Accounts, free and clear of all liens and encumbrances created or granted by Buyer, and that Buyer has full right and authority to reassign its interest in such Accounts. Any reassignment of Repurchaseable Accounts and Litigation Accounts to Seller shall be accomplished by (i) the delivery by Buyer to Seller of an executed written Bill of Sale and Reassignment in the form of Exhibit I hereto and (ii) the delivery by Buyer to Seller of a computer file, hard copy or microfiche list, containing a true and complete list of all Accounts which have been reassigned, identified by Account number. It is understood and agreed that the obligations of Seller to repurchase Repurchaseable Accounts and Litigation Accounts, deduct the Purchase Price paid by Buyer for Repurchaseable Accounts and Litigation Accounts from the Purchase Price to be paid by Buyer for Accounts purchased on a subsequent Closing Date, or substitute Accounts pursuant to the terms of this Article IX, shall constitute the sole remedy available to Buyer respecting such Accounts.

     9.2     Payments Received by Buyer Prior to or Following Account Repurchases. Any payments on Repurchaseable Accounts or Litigation Accounts received by Buyer either prior to or subsequent to Seller's repurchase or substitution of such Accounts pursuant to Paragraphs 9.1 and 11.1 hereunder, shall belong to Seller, and Buyer shall remit said payments to Seller at the time of substitution or repurchase or within 30 days after receipt, with negotiable instruments being endorsed by Buyer without recourse.

     9.3     Other Documents Delivered to Seller. On or before the initial Transfer Date, Buyer agrees to deliver to Seller a UCC Financing Statement with respect to all Uncollectible Accounts, Litigation Accounts and other Accounts as provided for in Article XI, endorsed and re-assigned to Seller hereunder.

ARTICLE X

<u>NO WARRANTIES OR REPRESENTATION EXPRESSED HEREIN</u>

     No Warranties. EXCEPT FOR THOSE EXPRESSED IN ARTICLE VII, NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, ARE OR HAVE BEEN MADE BY SELLER, OR ANYONE ACTING ON ITS BEHALF, PARTICULARLY, WITHOUT IN ANY WAY LIMITING THE GENERALITY OF THE FOREGOING, NO WARRANTIES OR REPRESENTATIONS REGARDING (i) THE COLLECTABILITY OF ANY ACCOUNT; (ii) THE CREDITWORTHINESS OF ANY DEBTOR; (iii) THE FORM OR SUFFICIENCY OF ANY ACCOUNT DOCUMENTATION; (iv) THE FORM OR SUFFICIENCY OF ANY COLLATERAL OF ANY TYPE WHICH SECURES THE REPAYMENT OF ANY ACCOUNT; (v) THE TRANSFERABILITY AND ENFORCEABILITY OF ACCOUNTS; OR (vi) THE VALIDITY OF ANY COLLATERAL DOCUMENT OR ITS RECORDATION. EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, ALL ACCOUNTS SOLD TO BUYER UNDER THIS AGREEMENT ARE SOLD AND TRANSFERRED WITHOUT RECOURSE.. EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLE VII, BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATION, WARRANTY, PROMISE, COVENANT, AGREEMENT OR GUARANTEE OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT

14

OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO (A) THE NATURE, QUALITY OR CONDITION OF THE ACCOUNTS, INCLUDING, WITHOUT LIMITATION TO OTHER DOCUMENTATION (B) THE INCOME TO BE DERIVED FROM THE ACCOUNTS OR, (C) THE SUITABILITY OF THE ACCOUNTS FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY INTEND, OR (D) ANY OTHER MATTER WITH RESPECT TO THE ACCOUNTS.  THE BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE ACCOUNTS WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION.  EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLE VII, BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE ACCOUNTS AS PROVIDED HEREIN IS MADE ON AN "AS IS" CONDITION AND BASIS WITH ALL FAULTS.

ARTICLE XI
ACCOUNTS EXCLUDED FROM SALE OR SUBJECT
TO REPURCHASE OR SUBSTITUTION

11.1  Discretionary Exclusion and Repurchase. Seller, in its sole discretion, may exclude from any sale of Accounts hereunder, prior to the applicable Closing Date or may require the reassignment of any Account, at any time, after the applicable Closing Date, provided Buyer (i) continues to own such Account at the time of Seller's request for reassignment of the Account or (ii) is able to obtain its reassignment from a subsequent buyer if Buyer sold the Account (a) which is subject to a bankruptcy proceeding as of the applicable Closing Date, (b) any Account, which forms the basis of a claim against any officer, director, employee, or agent of Seller, (c) any Account, which is subject to a written settlement agreement as of the applicable Closing Date, (d) any Account, the receivables of which, as of the applicable Closing Date, had been sold to a trust, (e) any Account, which as of the applicable Closing Date was in the process of being re-aged, (f) any Account which, as of the applicable Closing Date, the Debtor has claimed, through a statement in writing, that the Debtor did not open the Account or that the Account was fraudulently used, (g) any account which as of the applicable Closing Date does not meet the definition of an Account,  (h) any Account, which was charged-off by Seller in error, or (i) any Account, which is in litigation other than litigation brought by the Buyer or a subsequent buyer. Buyer represents, warrants and certifies to Seller that Buyer will use diligent efforts to obtain the reassignment of any Account Seller requests reassignment of under this Paragraph 11.1 if Buyer has subsequently sold such Account to a subsequent buyer. Seller shall, concurrently upon reassignment or in a reasonable time thereafter, pay the repurchase price of such Accounts, using the formula set forth in Paragraph 9.2 above, deduct the Purchase Price paid by Buyer for the Account from the Purchase Price to be paid by Buyer for the Accounts purchased on a subsequent Closing Date or, if there is no subsequent Closing Date in a subsequent month, substitute the Account with an Account of equal or greater Unpaid Balance and with a similar or more recent charge-off date.

11.2  Buyer's Duty to Purchase Not Affected.  Seller's exclusion, repurchase or substitution of one or more of the Accounts shall not affect Buyer's duty to purchase the remaining Accounts on the terms and conditions set forth in this Agreement.

15

11.3 **Transfer Following Repurchase or Substitution.** Buyer shall, endorse and/or reassign the Accounts to Seller prior to receipt of the repurchase price or a substitution of such Accounts. Upon endorsement and/or reassignment and subject to Buyer's receipt of good, valid and marketable title to the Accounts pursuant to Paragraph 7.2 (i) above, Buyer represents and warrants, as of the date Buyer reassigns the Accounts, Buyer has good, valid and marketable title to the Accounts, free and clear of all liens and encumbrances created or granted by Buyer, and that Buyer has full right and authority to reassign its interest in such Accounts. Any reassignment of Accounts to Seller shall be accomplished by (i) the delivery by Buyer to Seller of an executed written Bill of Sale and Reassignment in the form of Exhibit I, and (ii) the delivery by Buyer to Seller of a computer file, hard copy or microfiche list containing a true and complete list of all Accounts which have been reassigned, identified by account number.

11.4 **Other Documents Delivered to Seller.** As provided for in Paragraph 9.3, on or before the initial Transfer Date, Buyer agrees to deliver to Seller a UCC Financing Statement with respect to all Accounts endorsed and re-assigned to Seller pursuant to Paragraph 11.1.

## ARTICLE XII
## RELEASE AND INDEMNIFICATION

12.1 **Buyer's Release of Claim.** Buyer hereby releases and forever discharges Seller, its agents, servants, directors, officers, employees, shareholders, successors, assigns, and affiliates, (all such related persons hereinafter collectively called the "Related Persons"), of and from any and all causes of action, claims, demands, and remedies of whatsoever kind or nature that Buyer now has, or may in the future have, against Seller, and/or any Related Persons in any manner on account of, arising out of, or related to the Accounts purchased hereunder, except for actions or omissions of Seller or Related Persons relating to the Accounts which occurred prior to the applicable Closing Date or to Seller's breach of its obligations, representations and warranties hereunder.

12.2 **Buyer's Indemnification.** Except as to any of the Accounts excluded or repurchased by Seller pursuant to Article IX or XI, Buyer hereby agrees to indemnify, hold harmless, and defend Seller, together with any and all Related Persons (Seller and each such Related Persons herein called an "Indemnified Party"), from and against any losses, causes of action, liabilities, claims, demands, obligations, damages, costs and expenses, including reasonable attorneys' and accountants' fees, to which the Indemnified Party may become subject under any laws, statutes, rules, or regulations, or otherwise, of all federal, state, local, governmental, or quasi-governmental entities or authorities having jurisdiction, on account of, arising out of, or related to (i) any act, omission, conduct, misrepresentation, or activity of Buyer after any applicable Closing Date, (ii) any act, omission, conduct, misrepresentation, or activity of a buyer or subsequent buyer of an Account to which Buyer sold an Account, directly or indirectly, if Buyer is unable to reassign such Account to Seller under Paragraph 11.1 hereunder, or (iii) any of Buyer's officers, directors, employees, agents, servants, shareholders, successors, or assigns, on account of, arising out of, or related to (1) this Agreement and (2)

16

any or all Accounts purchased hereunder.

12.3  Seller's Indemnification.  Seller hereby agrees to indemnify, hold harmless, and defend Buyer, (herein called an "Indemnified Party"), from and against any losses, causes of action, liabilities, claims, demands, obligations, damages, costs, and expenses, including reasonable attorneys' and accountants' fees, to which the Indemnified Party may become subject under any laws, statutes, rules, or regulations, or otherwise, of all federal, state, local, governmental, or quasi-governmental entities or authorities having jurisdiction, on account of, arising out of, or related to, any act, omission, conduct, misrepresentation, or activity of Seller prior to any applicable Closing Date, or any of Seller's officers, directors, employees, agents, servants, shareholders, successors, or assigns, on account of, arising out of, or related to (1) this Agreement, and (2) any or all Accounts purchased hereunder.

12.4  Notice of Claim.  Promptly after receipt by the Indemnified Party under Paragraph 12.2 or 12.3 above of notice of the commencement of any action to which Paragraph 12.2 or 12.3 shall apply, the Indemnified Party shall notify the other party in writing of the commencement of such action if a claim in respect of such action is to be made against Buyer under Paragraph 12.2 or Seller under Paragraph 12.3; but the failure to notify such party shall not relieve the other party from any liability that such party may have to the Indemnified Party, except to the extent that any such party is prejudiced by the failure of notification.  In case any such action is brought against Seller or Buyer, and the Indemnified Party notifies the other party of the commencement of such action, the notified party shall be entitled to participate in such action and, to the extent that the notified party may wish to assume the defense of such action, with counsel selected by such notified party and approved by the Indemnified Party, and after notice from the notified party to the Indemnified Party of the notified party's election to so assume the defense of such action, the notified party shall not be liable to the Indemnified Party under this Article for any additional legal and other expenses subsequently incurred by the Indemnified Party in connection with the defense of such action.

12.5  Indemnified Party's Own Counsel.  Notwithstanding any other provision of this Article XII, if, in any action or claim as to which Indemnity is or may be available, the Indemnified Party reasonably determines that its interests are or may be adverse, in whole or in part, to the interests of the party or that there may be legal defenses available to the Indemnified Party that are different from, in addition to, or inconsistent with, the defenses available to the other party, the Indemnified Party may retain its own counsel in connection with such action or claim and shall be indemnified by the other party for any legal and other expenses reasonably incurred in connection with investigating or defending such action or claim.  In no event, however, shall either party be liable for the fees and expenses of more than one counsel for all parties in connection with any one action or in connection with separate but similar or related actions in the same jurisdiction arising out of the same general allegations.

12.6  Settlement.  Neither party shall be liable for any settlement of any such action effected without its express written consent, but if any such action is settled with

17

the express written consent of all parties or if there is a final judgment for the plaintiff in any such action, Buyer or Seller as the case may be shall indemnify, hold harmless, and defend the Indemnified Party from and against any loss or liability by reason of such settlement or judgment as and in the manner described in Paragraph 12.2 or 12.3 above. Notwithstanding anything in this Agreement to the contrary, if Seller settles any litigation (with or without the Buyer's consent) involving an Account and such settlement permits or requires Seller to compensate a plaintiff or plaintiffs by crediting all or a portion of the Unpaid Balance(s) on the plaintiff's or plaintiffs' Account(s), Buyer shall be obligated to credit such Accounts as instructed by Seller in accordance with the terms of the settlement agreement in the litigation and Seller shall be obligated to reimburse Buyer for the dollar amount by which Buyer credited the Unpaid Balance on the Account(s) multiplied by the Purchase Price. To the extent any of the Accounts affected by such a settlement are the subject of additional pending litigation filed by Buyer or of a judgment entered by a court in favor of Buyer, it will be Buyer's sole responsibility to amend the relevant pleadings or judgment to reflect the dollar amount by which the Account has been credited. Buyer understands and agrees that, to the extent it credits the Unpaid Balance on an Account at Seller's instructions in accordance with the terms of a settlement agreement related to the litigation, Buyer has no remedy from Seller other than Seller's payment to Buyer of the dollar amount by which the Unpaid Balance of the Account was credited multiplied by the Purchase Price. In addition, Seller is under no obligation to repurchase or replace any Accounts which are subject to a credit pursuant to the terms of this Paragraph.



## ARTICLE XIII
### MISCELLANEOUS

13.1  **Notices.**  Any notices, requests, demands, or other communications between the parties hereto shall be in writing and deemed given when received, whether hand-delivered or sent by certified or registered mail, postage prepaid, return receipt requested, or by facsimile to such party at its address set forth below or at such other address as such party shall hereafter furnish in writing:

BUYER:

First Select, Inc.
4460 Rosewood Drive
Pleasanton, California  94566
Attn: Rick Wittwer, Vice President

COPY TO:

First Select, Inc.
1600 Ormsby Station Court
Louisville, KY 40223
Attn: Michael Sims, President

18

SELLER:

Discover Bank
12 Read's Way
New Castle, Delaware 19720
Attention: Kathy Roberts, President

COPY TO:

Discover Financial Services, Inc
2500 Lake Cook Road
Riverwoods, Illinois 60015
Attention: Wayne Johnson, National Director, Collections

Discover Financial Services, Inc.
3311 Mill Meadow Dr.
Hilliard, Ohio 43026
Attn: Robert Deter, Placement Manager

13.2  Assignment; Binding Effect.  This Agreement and the terms, covenants, conditions, provisions, obligations, undertaking, rights and benefits hereof, including the attachments hereto, shall be binding upon, and shall inure to the benefit of the undersigned parties and their respective heirs, executors, administrators, representatives, successors and assigns.  Neither party may assign this Agreement or any of its rights in this Agreement without the other's prior written consent, except as provided in Paragraph 8.6.  Notwithstanding anything in this Agreement to the contrary, Seller's duties and obligations under this Agreement shall not inure to the benefit of any transferee of Accounts without the prior written consent of such Seller. 

13.3  Informational Tax Reporting.  With respect to the 2001 and subsequent tax years, Buyer hereby agrees to perform all obligations of Seller with respect to Federal and State income tax reporting relating to the Accounts sold under this Agreement, including obligations with respect to Internal Revenue Code Forms 1098 and 1099 and back-up withholding.

13.4  Severability.  If any provision of this Agreement shall be determined to be invalid or unenforceable, the remaining provisions of this Agreement shall not be affected thereby, and every provision of this Agreement shall remain in full force and effect and enforceable to the fullest extent permitted by law.

13.5  Headings.  The headings appearing in this Agreement are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of any Article or Paragraph of this Agreement.

13.6  Survival.  Except as otherwise provided in this Agreement, the covenants, warranties, and representations herein contained shall survive the applicable Closing Dates

20

and the termination of this Agreement.

13.7   Waiver.  Neither party's waiver of the other's breach of any term, covenant or condition contained in this Agreement shall be deemed to be a waiver of any subsequent breach of the same or any other term, covenant or condition in this Agreement.

13.8   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

13.9   Governing Law.  This Agreement shall be governed by and construed in accordance with all applicable federal laws and regulations, and, to the extent applicable, the laws of the State of Delaware.

13.10   Entire Agreement; Modification.   This Agreement and the materials incorporated herein by reference constitute the entire agreement of the parties, superseding all other and prior agreements and understandings between or among the parties relating to the subject matter of this Agreement.  If there is any inconsistency between the terms of this Agreement and any material incorporated herein by reference, the terms of this Agreement shall govern.  There are no promises or other agreements, oral or written, express or implied, between the parties, their employees, agents, representatives or independent contractors other than as set forth in this Agreement.  No change or modification of, or waiver under, this Agreement shall be valid unless it is in writing and signed by duly authorized representatives of Seller and Buyer.

13.11   Confidentiality.  Buyer acknowledges that any non-public information of the Seller, including Seller's respective affiliates, which has or will come into the possession or knowledge of the Buyer in connection with this Agreement or the performance hereof, is considered confidential and proprietary information ("Confidential Information").  Confidential Information shall not include information in the public domain, information known to the Buyer prior to commencement of any discussions in contemplation of this Agreement, information lawfully obtained from a third party by Buyer or information relating to Accounts after the sale of such Accounts to Buyer hereunder, provided however, Buyer agrees to comply with all confidentiality obligations of the cardmember agreements applicable to the Accounts. Buyer agrees Confidential Information will be used solely in connection with the performance of the terms and conditions hereunder and will not be disclosed to any third party or to any of the Buyer's affiliates, directors, officers, employees, agents or advisors, except those with a "need to know."  Any such disclosure to a third party shall be made only upon receipt of a written confidentiality agreement from such third party substantially as comprehensive in terms as those contained herein. Buyer shall take all reasonable steps to preserve and protect the Confidential Information of the Seller. All Confidential Information and any copies thereof, shall be returned to the Seller upon request or upon termination or expiration of this Agreement, unless previously destroyed by Buyer. Buyer shall cause its affiliates, directors, officers, employees, agents and advisors to keep confidential the Confidential Information, the existence of this Agreement and the nature of the parties' obligations hereunder. Buyer agrees that if it violates the provisions of this Paragraph, Seller may immediately terminate this Agreement, and in addition to any other rights and remedies Seller may have, Seller shall be entitled to injunctive or other equitable or

21

legal relief preventing Buyer and Buyer's affiliates, directors, officers, employees, agents and advisors from continuing such violation.

13.12   Facsimile Signatures. All signatures to this Agreement may be delivered by facsimile and such facsimile signatures shall be binding and shall have the full force and effect of original signatures.

22

13.13 Termination. This Agreement may be terminated by Seller at any time and shall be of no further force and effect, upon the occurrence of the following: (I) Buyer's breach or default in the performance of any covenant, agreement, representation or warranty hereunder; (ii) Buyer becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due; or Buyer applies for, consents to, or acquiesces in the appointment of, a trustee, receiver or other custodian for the Buyer or any property thereof, or makes a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for the Buyer or for a substantial part of its property and is not discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution, liquidation, or similar proceeding, is commenced by the Buyer, it is consented to or acquiesced in by the Buyer or remains undismissed for thirty (30) days; or the Buyer takes any corporate action to authorize, or in furtherance of, any of the foregoing; or (iii) Seller reasonably determines that the continued sale of Accounts to Buyer is likely to adversely affect Seller's public image.

This Agreement may be terminated by Buyer at any time and shall be of no further force and effect, upon Seller's material breach or default in the performance of any covenant, agreement, representation or warranty hereunder.

Without modifying or limiting the parties' termination rights above, either party may tender notice to terminate the Agreement by delivery of notice to the other party at least ninety (90) days prior to the effective date of termination. Solely for purposes of this termination provision, if either party terminates the Agreement, any termination notice delivered during a month shall be deemed given on the last day of that month, and, Seller shall be obligated to sell and Buyer shall be obligated to buy Accounts in the month that the termination notice is delivered and three (3) additional months thereafter.

IN WITNESS WHEREOF, the parties hereto, through their duly authorized representatives, have caused this Agreement to be executed as of the Effective Date.

FIRST SELECT, INC.                          DISCOVER BANK

By: _____          By: _____

Title: _____        Title: _President_____

\\DWDC-IT-2\SYS\LAW_USER\brow971\DSLG\Bill of Sale\Agreements\First Select Sale of Acct NONTRUST amended and restated.doc

23

**13.13 Termination.** This Agreement may be terminated by Seller at any time and shall be of no further force and effect, upon the occurrence of the following: (i) Buyer's breach or default in the performance of any covenant, agreement, representation or warranty hereunder; (ii) Buyer becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due; or Buyer applies for, consents to, or acquiesces in the appointment of, a trustee, receiver or other custodian for the Buyer or any property thereof, or makes a general assignment for the benefit of creditors; or in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for the Buyer or for a substantial part of its property and is not discharged within thirty (30) days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution, liquidation, or similar proceeding, is commenced by the Buyer, it is consented to or acquiesced in by the Buyer or remains undismissed for thirty (30) days; or the Buyer takes any corporate action to authorize, or in furtherance of, any of the foregoing; or (iii) Seller reasonably determines that the continued sale of Accounts to Buyer is likely to adversely affect Seller's public image.

This Agreement may be terminated by Buyer at any time and shall be of no further force and effect, upon Seller's material breach or default in the performance of any covenant, agreement, representation or warranty hereunder.

Without modifying or limiting the parties' termination rights above, either party may tender notice to terminate the Agreement by delivery of notice to the other party at least ninety (90) days prior to the effective date of termination. Solely for purposes of this termination provision, if either party terminates the Agreement, any termination notice delivered during a month shall be deemed given on the last day of that month, and, Seller shall be obligated to sell and Buyer shall be obligated to buy Accounts in the month that the termination notice is delivered and three (3) additional months thereafter.

IN WITNESS WHEREOF, the parties hereto, through their duly authorized representatives, have caused this Agreement to be executed as of the Effective Date.

FIRST SELECT, INC.                              DISCOVER BANK

By: _____                  By: _____

Title: SR. V.P. First Select                    Title: _____

\\DWDC-IT-2SYS\LAW_USER\8rbw271\DISLQ\Bill of Sales\Agreement\First Select Sale of Acct NONTRUST amended and restated.doc

23